# OHRALIK *v.* OHIO STATE BAR ASSN.

No. 76–1650.  Argued January 16, 1978—Decided May 30, 1978

Powell, J., delivered the opinion of the Court, in which Burger, C. J., and Stewart, White, Blackmun, and Stevens, JJ., joined. Marshall, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 468. Rehnquist, J., filed a statement concurring in the judgment, *post*, p. 477. Brennan, J., took no part in the consideration or decision of the case.

*Eugene Gressman* argued the cause and filed briefs for appellant.

*John R. Welch* argued the cause for appellee. With him on the brief were *Albert L. Bell, Edward N. Heiser,* and *Thomas E. Palmer.**

Mr. Justice Powell delivered the opinion of the Court.

In *Bates* v. *State Bar of Arizona,* 433 U. S. 350 (1977), this Court held that truthful advertising of "routine" legal services is protected by the First and Fourteenth Amendments against

---

*William B. Spann, Jr.,* and *H. Blair White* filed a brief for the American Bar Assn. as *amicus curiae* urging affirmance.

*Girardeau A. Spann* and *Alan B. Morrison* filed a brief for Public Citizen et al. as *amici curiae.*

blanket prohibition by a State. The Court expressly reserved the question of the permissible scope of regulation of "in-person solicitation of clients—at the hospital room or the accident site, or in any other situation that breeds undue influence—by attorneys or their agents or 'runners.' " *Id.*, at 366. Today we answer part of the question so reserved, and hold that the State—or the Bar acting with state authoriza-tion—constitutionally may discipline a lawyer for soliciting clients in person, for pecuniary gain, under circumstances likely to pose dangers that the State has a right to prevent.

## I

Appellant, a member of the Ohio Bar, lives in Montville, Ohio. Until recently he practiced law in Montville and Cleve-land. On February 13, 1974, while picking up his mail at the Montville Post Office, appellant learned from the postmaster's brother about an automobile accident that had taken place on February 2 in which Carol McClintock, a young woman with whom appellant was casually acquainted, had been injured. Appellant made a telephone call to Ms. McClintock's parents, who informed him that their daughter was in the hospital. Appellant suggested that he might visit Carol in the hospital. Mrs. McClintock assented to the idea, but requested that appellant first stop by at her home.

During appellant's visit with the McClintocks, they ex-plained that their daughter had been driving the family automobile on a local road when she was hit by an uninsured motorist. Both Carol and her passenger, Wanda Lou Holbert, were injured and hospitalized. In response to the McClintocks' expression of apprehension that they might be sued by Holbert, appellant explained that Ohio's guest statute would preclude such a suit. When appellant suggested to the McClintocks that they hire a lawyer, Mrs. McClintock retorted that such a decision would be up to Carol, who was 18 years old and would be the beneficiary of a successful claim.

450

Appellant proceeded to the hospital, where he found Carol lying in traction in her room. After a brief conversation about her condition,[1] appellant told Carol he would represent her and asked her to sign an agreement. Carol said she would have to discuss the matter with her parents. She did not sign the agreement, but asked appellant to have her parents come to see her.[2] Appellant also attempted to see Wanda Lou Holbert, but learned that she had just been released from the hospital. App. 98a. He then departed for another visit with the McClintocks.

On his way appellant detoured to the scene of the accident, where he took a set of photographs. He also picked up a tape recorder, which he concealed under his raincoat before arriving at the McClintocks' residence. Once there, he re-examined their automobile insurance policy, discussed with them the law applicable to passengers, and explained the consequences of the fact that the driver who struck Carol's car was an uninsured motorist. Appellant discovered that the McClintocks' insurance policy would provide benefits of up to $12,500 each for Carol and Wanda Lou under an uninsured-motorist clause. Mrs. McClintock acknowledged that both Carol and Wanda Lou could sue for their injuries, but recounted to appellant that "Wanda swore up and down she would not do it." *Ibid.* The McClintocks also told appellant that Carol had phoned to say that appellant could "go ahead" with her representation. Two days later appellant returned to Carol's hospital room to have her sign a contract, which provided that he would receive one-third of her recovery.

---

[1] Carol also mentioned that one of the hospital administrators was urging a lawyer upon her. According to his own testimony, appellant replied: "Yes, this certainly is a case that would entice a lawyer. That would interest him a great deal." App. 53a.

[2] Despite the fact that appellant maintains that he did not secure an agreement to represent Carol while he was at the hospital, he waited for an opportunity when no visitors were present and then took photographs of Carol in traction. *Id.*, at 129a.

In the meantime, appellant obtained Wanda Lou's name and address from the McClintocks after telling them he wanted to ask her some questions about the accident. He then visited Wanda Lou at her home, without having been invited. He again concealed his tape recorder and recorded most of the conversation with Wanda Lou.[3]  After a brief, unproductive inquiry about the facts of the accident, appellant told Wanda Lou that he was representing Carol and that he had a "little tip" for Wanda Lou: the McClintocks' insurance policy contained an uninsured-motorist clause which might provide her with a recovery of up to $12,500.  The young woman, who was 18 years of age and not a high school graduate at the time, replied to appellant's query about whether she was going to file a claim by stating that she really did not understand what was going on.  Appellant offered to represent her, also, for a contingent fee of one-third of any recovery, and Wanda Lou stated "O. K." [4]

Wanda's mother attempted to repudiate her daughter's oral assent the following day, when appellant called on the tele-

---

[3] Appellant maintains that the tape is a complete reproduction of everything that was said at the Holbert home.  Wanda Lou testified that the tape does not contain appellant's introductory remarks to her about his identity as a lawyer, his agreement to represent Carol McClintock, and his availability and willingness to represent Wanda Lou as well.  *Id.*, at 19a–21a.  Appellant disputed Wanda Lou's testimony but agreed that he did not activate the recorder until he had been admitted to the Holbert home and was seated in the living room with Wanda Lou.  *Id.*, at 58a.

[4] Appellant told Wanda that she should indicate assent by stating "O. K.," which she did.  Appellant later testified: "I would say that most of my clients have essentially that much of a communication. . . .  I think most of my clients, that's the way I practice law."  *Id.*, at 81a.

In explaining the contingent-fee arrangement, appellant told Wanda Lou that his representation would not "cost [her] anything" because she would receive two-thirds of the recovery if appellant were successful in representing her but would not "have to pay [him] anything" otherwise.  *Id.*, at 120a, 125a.

phone to speak to Wanda. Mrs. Holbert informed appellant that she and her daughter did not want to sue anyone or to have appellant represent them, and that if they decided to sue they would consult their own lawyer. Appellant insisted that Wanda had entered into a binding agreement. A month later Wanda confirmed in writing that she wanted neither to sue nor to be represented by appellant. She requested that appellant notify the insurance company that he was not her lawyer, as the company would not release a check to her until he did so.[5] Carol also eventually discharged appellant. Although another lawyer represented her in concluding a settlement with the insurance company, she paid appellant one-third of her recovery[6] in settlement of his lawsuit against her for breach of contract.[7]

Both Carol McClintock and Wanda Lou Holbert filed complaints against appellant with the Grievance Committee of the Geauga County Bar Association. The County Bar Association referred the grievance to appellee, which filed a formal complaint with the Board of Commissioners on Grievances

---

[5] The insurance company was willing to pay Wanda Lou for her injuries but would not release the check while appellant claimed, and Wanda Lou denied, that he represented her. Before appellant would "disavow further interest and claim" in Wanda Lou's recovery, he insisted by letter that she first pay him the sum of $2,466.66, which represented one-third of his "conservative" estimate of the worth of her claim. *Id.*, at 26a–27a.

[6] Carol recovered the full $12,500 and paid appellant $4,166.66. She testified that she paid the second lawyer $900 as compensation for his services. *Id.*, at 38a, 42a.

[7] Appellant represented to the Board of Commissioners at the disciplinary hearing that he would abandon his claim against Wanda Lou Holbert because "the rules say that if a contract has its origin in a controversy, that an ethical question can arise." Tr. 256. Yet in fact appellant filed suit against Wanda for $2,466.66 after the disciplinary hearing. *Ohralik v. Holbert*, Case No. 76–CV–F–66 (Chardon Mun. Ct., Geauga County, Ohio, filed Feb. 2, 1976). Appellant's suit was dismissed with prejudice on January 27, 1977, after the decision of the Supreme Court of Ohio had been filed.

and Discipline of the Supreme Court of Ohio.[8]   After a hearing, the Board found that appellant had violated Disciplinary Rules (DR) 2–103 (A) and 2–104 (A) of the Ohio Code of Professional Responsibility.[9]   The Board rejected appellant's defense that his conduct was protected under the First and Fourteenth Amendments.   The Supreme Court of Ohio adopted the findings of the Board,[10] reiterated that appellant's conduct was not constitutionally protected, and increased the

---

[8] The Board of Commissioners is an agent of the Supreme Court of Ohio. Counsel for appellee stated at oral argument that the Board has "no connection with the Ohio State Bar Association whatsoever." Tr. of Oral Arg. 24.

[9] The Ohio Code of Professional Responsibility is promulgated by the Supreme Court of Ohio.  The Rules under which appellant was disciplined are modeled on the same-numbered rules in the Code of Professional Responsibility of the American Bar Association.  DR 2–103 (A) of the ABA Code has since been amended so as not to proscribe forms of public advertising that would be permitted, after Bates, under amended DR 2–101 (B).

DR 2–103 (A) of the Ohio Code (1970) provides:

"A lawyer shall not recommend employment, as a private practitioner, of himself, his partner, or associate to a non-lawyer who has not sought his advice regarding employment of a lawyer."

DR 2–104 (A) (1970) provides in relevant part:

"A lawyer who has given unsolicited advice to a layman that he should obtain counsel or take legal action shall not accept employment resulting from that advice, except that:

"(1) A lawyer may accept employment by a close friend, relative, former client (if the advice is germane to the former employment), or one whom the lawyer reasonably believes to be a client."

[10] The Board found that Carol and Wanda Lou "were, if anything, casual acquaintances" of appellant; that appellant initiated the contact with Carol and obtained her consent to handle her claim; that he advised Wanda Lou that he represented Carol, had a "tip" for Wanda, and was prepared to represent her, too.  The Board also found that appellant would not abide by Mrs. Holbert's request to leave Wanda alone, that both young women attempted to discharge appellant, and that appellant sued Carol McClintock.

sanction of a public reprimand recommended by the Board to indefinite suspension.

The decision in *Bates* was handed down after the conclusion of proceedings in the Ohio Supreme Court. We noted probable jurisdiction in this case to consider the scope of protection of a form of commercial speech, and an aspect of the State's authority to regulate and discipline members of the bar, not considered in *Bates*. 434 U. S. 814 (1977). We now affirm the judgment of the Supreme Court of Ohio.

## II

The solicitation of business by a lawyer through direct, in-person communication with the prospective client has long been viewed as inconsistent with the profession's ideal of the attorney-client relationship and as posing a significant potential for harm to the prospective client. It has been proscribed by the organized Bar for many years.[11] Last Term the Court ruled that the justifications for prohibiting truthful, "restrained" advertising concerning "the availability and terms of routine legal services" are insufficient to override society's interest, safeguarded by the First and Fourteenth Amendments, in assuring the free flow of commercial information.

---

[11] An informal ban on solicitation, like that on advertising, historically was linked to the goals of preventing barratry, champerty, and maintenance. See Note, Advertising, Solicitation and the Profession's Duty to Make Legal Counsel Available, 81 Yale L. J. 1181, 1181–1182, and n. 6 (1972). "The first Code of Professional Ethics in the United States was that formulated and adopted by the Alabama State Bar Association in 1887." H. Drinker, Legal Ethics 23 (1953). The "more stringent prohibitions which form the basis of the current rules" were adopted by the American Bar Association in 1908. Note, 81 Yale L. J., *supra*, at 1182; see Drinker, *supra*, at 215. The present Code of Professional Responsibility, containing DR 2–103 (A) and 2–104 (A), was adopted by the American Bar Association in 1969 after more than four years of study by a special committee of the Association. It is a complete revision of the 1908 Canons, although many of its provisions proscribe conduct traditionally deemed unprofessional and detrimental to the public.

*Bates,* 433 U. S., at 384; see *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council,* 425 U. S. 748 (1976). The balance struck in *Bates* does not predetermine the outcome in this case. The entitlement of in-person solicitation of clients to the protection of the First Amendment differs from that of the kind of advertising approved in *Bates,* as does the strength of the State's countervailing interest in prohibition.

A

Appellant contends that his solicitation of the two young women as clients is indistinguishable, for purposes of constitutional analysis, from the advertisement in *Bates.* Like that advertisement, his meetings with the prospective clients apprised them of their legal rights and of the availability of a lawyer to pursue their claims. According to appellant, such conduct is "presumptively an exercise of his free speech rights" which cannot be curtailed in the absence of proof that it actually caused a specific harm that the State has a compelling interest in preventing. Brief for Appellant 39. But in-person solicitation of professional employment by a lawyer does not stand on a par with truthful advertising about the availability and terms of routine legal services, let alone with forms of speech more traditionally within the concern of the First Amendment.

Expression concerning purely commercial transactions has come within the ambit of the Amendment's protection only recently.[12] In rejecting the notion that such speech "is wholly outside the protection of the First Amendment," *Virginia Pharmacy, supra,* at 761, we were careful not to hold "that it is wholly undifferentiable from other forms" of speech. 425 U. S., at 771 n. 24. We have not discarded the "common-

---

[12] See *Valentine* v. *Chrestensen,* 316 U. S. 52 (1942); *Pittsburgh Press Co.* v. *Human Relations Comm'n,* 413 U. S. 376 (1973); *Bigelow* v. *Virginia,* 421 U. S. 809 (1975); *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council,* 425 U. S. 748 (1976).

sense" distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech. *Ibid.* To require a parity of constitutional protection for commercial and noncommercial speech alike could invite dilution, simply by a leveling process, of the force of the Amendment's guarantee with respect to the latter kind of speech. Rather than subject the First Amendment to such a devitalization, we instead have afforded commercial speech a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values, while allowing modes of regulation that might be impermissible in the realm of noncommercial expression.

Moreover, "it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Giboney* v. *Empire Storage & Ice Co.*, 336 U. S. 490, 502 (1949). Numerous examples could be cited of communications that are regulated without offending the First Amendment, such as the exchange of information about securities, *SEC* v. *Texas Gulf Sulphur Co.*, 401 F. 2d 833 (CA2 1968), cert. denied, 394 U. S. 976 (1969), corporate proxy statements, *Mills* v. *Electric Auto-Lite Co.*, 396 U. S. 375 (1970), the exchange of price and production information among competitors, *American Column & Lumber Co.* v. *United States,* 257 U. S. 377 (1921), and employers' threats of retaliation for the labor activities of employees, *NLRB* v. *Gissel Packing Co.*, 395 U. S. 575, 618 (1969). See *Paris Adult Theatre I* v. *Slaton,* 413 U. S. 49, 61–62 (1973). Each of these examples illustrates that the State does not lose its power to regulate commercial activity deemed harmful to the public whenever speech is a component of that activity. Neither *Virginia Pharmacy* nor *Bates* purported to cast doubt on the permissibility of these kinds of commercial regulation.

In-person solicitation by a lawyer of remunerative employment is a business transaction in which speech is an essential but subordinate component. While this does not remove the speech from the protection of the First Amendment, as was held in *Bates* and *Virginia Pharmacy*, it lowers the level of appropriate judicial scrutiny.

As applied in this case, the Disciplinary Rules are said to have limited the communication of two kinds of information. First, appellant's solicitation imparted to Carol McClintock and Wanda Lou Holbert certain information about his availability and the terms of his proposed legal services. In this respect, in-person solicitation serves much the same function as the advertisement at issue in *Bates*. But there are significant differences as well. Unlike a public advertisement, which simply provides information and leaves the recipient free to act upon it or not, in-person solicitation may exert pressure and often demands an immediate response, without providing an opportunity for comparison or reflection.[13] The aim and effect of in-person solicitation may be to provide a one-sided presentation and to encourage speedy and perhaps uninformed decisionmaking; there is no opportunity for intervention or counter-education by agencies of the Bar, supervisory authorities, or persons close to the solicited individual. The admonition that "the fitting remedy for evil counsels is good ones"[14] is of little value when the circumstances provide no opportunity for any remedy at all. In-person solicitation is as likely as not to discourage persons needing counsel from engaging in a critical comparison of the "availability, nature, and prices"

---

[13] The immediacy of a particular communication and the imminence of harm are factors that have made certain communications less protected than others. Compare *Cohen* v. *California*, 403 U. S. 15 (1971), with *Chaplinsky* v. *New Hampshire*, 315 U. S. 568 (1942); see *Brandenburg* v. *Ohio*, 395 U. S. 444 (1969); *Schenck* v. *United States*, 249 U. S. 47 (1919).

[14] *Whitney* v. *California*, 274 U. S. 357, 375 (1927) (Brandeis, J., concurring).

of legal services, cf. *Bates,* 433 U. S., at 364; it actually may disserve the individual and societal interest, identified in *Bates,* in facilitating "informed and reliable decisionmaking." *Ibid.*[15]

It also is argued that in-person solicitation may provide the solicited individual with information about his or her legal rights and remedies. In this case, appellant gave Wanda Lou a "tip" about the prospect of recovery based on the un-insured-motorist clause in the McClintocks' insurance policy, and he explained that clause and Ohio's guest statute to Carol McClintock's parents. But neither of the Disciplinary Rules here at issue prohibited appellant from communicating information to these young women about their legal rights and the prospects of obtaining a monetary recovery, or from recommending that they obtain counsel. DR 2-104 (A) merely prohibited him from using the information as bait with which to obtain an agreement to represent them for a fee. The Rule does not prohibit a lawyer from giving unsolicited legal advice; it proscribes the acceptance of employment resulting from such advice.

Appellant does not contend, and on the facts of this case could not contend, that his approaches to the two young women involved political expression or an exercise of associational freedom, "employ[ing] constitutionally privileged means of expression to secure constitutionally guaranteed civil rights." *NAACP* v. *Button,* 371 U. S. 415, 442 (1963); see *In re Primus, ante,* p. 412. Nor can he compare his solicitation to the mutual assistance in asserting legal rights that was at issue in *United Transportation Union* v. *Michigan Bar,* 401 U. S. 576 (1971); *Mine Workers* v. *Illinois Bar Assn.,* 389 U. S. 217

---

[15] We do not minimize the importance of providing low- and middle-income individuals with adequate information about the availability of legal services. The Bar is aware of this need and innovative measures are being implemented, see *Bates,* 433 U. S., at 398–399 (opinion of POWELL, J.). In addition, the advertising permitted under *Bates* will provide a further source of such information.

(1967); and *Railroad Trainmen* v. *Virginia Bar,* 377 U. S. 1
(1964).[16] A lawyer's procurement of remunerative employment is a subject only marginally affected with First Amendment concerns. It falls within the State's proper sphere of economic and professional regulation. See *Button, supra,* at 439–443. While entitled to some constitutional protection, appellant's conduct is subject to regulation in furtherance of important state interests.

---

[16] In *Railroad Trainmen* v. *Virginia Bar,* the Court highlighted the difference between permissible regulation of lawyers and regulation that impinges on the associational rights of union members: "Here what Virginia has sought to halt is not a commercialization of the legal profession which might threaten the moral and ethical fabric of the administration of justice. It is not 'ambulance chasing.'" 377 U. S., at 6. The Court implicitly approved of the State's regulation of conduct characterized colloquially as "ambulance chasing." See generally *Cohen* v. *Hurley,* 366 U. S. 117 (1961); Note, 30 N. Y. U. L. Rev. 182 (1955). Indeed, in ruling that the railroad workers had a constitutional right "to gather together for the lawful purpose of helping and advising one another" in asserting federal statutory rights, 377 U. S., at 5, the Court adverted to the kind of problem with which Ohio is concerned in prohibiting solicitation:

"Injured workers or their families often fell prey on the one hand to persuasive claims adjusters eager to gain a quick and cheap settlement for their railroad employers, or on the other to lawyers either not competent to try these lawsuits against the able and experienced railroad counsel or too willing to settle a case for a quick dollar." *Id.,* at 3–4.

In recognizing the importance of the State's interest in regulating solicitation of paying clients by lawyers, we are not unmindful of the problem of the related practice, described in *Railroad Trainmen,* of the solicitation of releases of liability by claims agents or adjusters of prospective defendants or their insurers. Such solicitations frequently occur prior to the employment of counsel by the injured person and during circumstances posing many of the dangers of overreaching we address in this case. Where lay agents or adjusters are involved, these practices for the most part fall outside the scope of regulation by the organized Bar; but releases or settlements so obtained are viewed critically by the courts. See, *e. g., Florkiewicz* v. *Gonzalez,* 38 Ill. App. 3d 115, 347 N. E. 2d 401 (1976); *Cady* v. *Mitchell,* 208 Pa. Super. 16, 220 A. 2d 373 (1966).

## B

The state interests implicated in this case are particularly strong. In addition to its general interest in protecting consumers and regulating commercial transactions, the State bears a special responsibility for maintaining standards among members of the licensed professions. See *Williamson* v. *Lee Optical Co.,* 348 U. S. 483 (1955); *Semler* v. *Oregon State Bd. of Dental Examiners,* 294 U. S. 608 (1935). "The interest of the States in regulating lawyers is especially great since lawyers are essential to the primary governmental function of administering justice, and have historically been 'officers of the courts.'" *Goldfarb* v. *Virginia State Bar,* 421 U. S. 773, 792 (1975). While lawyers act in part as "self-employed businessmen," they also act "as trusted agents of their clients, and as assistants to the court in search of a just solution to disputes." *Cohen* v. *Hurley,* 366 U. S. 117, 124 (1961).

As is true with respect to advertising, see *Bates, supra,* at 371, it appears that the ban on solicitation by lawyers originated as a rule of professional etiquette rather than as a strictly ethical rule. See H. Drinker, Legal Ethics 210–211, and n. 3 (1953). "[T]he rules are based in part on deeply ingrained feelings of tradition, honor and service. Lawyers have for centuries emphasized that the promotion of justice, rather than the earning of fees, is the goal of the profession." Comment, A Critical Analysis of Rules Against Solicitation by Lawyers, 25 U. Chi. L. Rev. 674 (1958) (footnote omitted). But the fact that the original motivation behind the ban on solicitation today might be considered an insufficient justification for its perpetuation does not detract from the force of the other interests the ban continues to serve. Cf. *McGowan* v. *Maryland,* 366 U. S. 420, 431, 433–435, 444 (1961). While the Court in *Bates* determined that truthful, restrained advertising of the prices of "routine" legal services would not have an adverse effect on the professionalism of lawyers, this was only because it found "the postulated connection between

advertising and the erosion of *true professionalism* to be severely strained." 433 U. S., at 368 (emphasis supplied). The *Bates* Court did not question a State's interest in maintaining high standards among licensed professionals.[17] Indeed, to the extent that the ethical standards of lawyers are linked to the service and protection of clients, they do further the goals of "true professionalism."

The substantive evils of solicitation have been stated over the years in sweeping terms: stirring up litigation, assertion of fraudulent claims, debasing the legal profession, and potential harm to the solicited client in the form of overreaching, overcharging, underrepresentation, and misrepresentation.[18] The American Bar Association, as *amicus curiae,* defends the rule against solicitation primarily on three broad grounds: It is said that the prohibitions embodied in DR 2–103 (A) and 2–104 (A) serve to reduce the likelihood of overreaching and the exertion of undue influence on lay persons, to protect the privacy of individuals, and to avoid situations where the lawyer's exercise of judgment on behalf of the client will be clouded by his own pecuniary self-interest.[19]

---

[17] In *Virginia Pharmacy* we stated that it is indisputable that the State has a "strong interest" in maintaining "a high degree of professionalism on the part of licensed pharmacists." 425 U. S., at 766. See also *National Society of Professional Engineers* v. *United States,* 435 U. S. 679, 696 (1978).

[18] See, *e. g.,* Note, 81 Yale L. J., *supra,* n. 11, at 1184; Comment, A Critical Analysis of Rules Against Solicitation by Lawyers, 25 U. Chi. L. Rev. 674 (1958).

[19] A lawyer who engages in personal solicitation of clients may be inclined to subordinate the best interests of the client to his own pecuniary interests. Even if unintentionally, the lawyer's ability to evaluate the legal merit of his client's claims may falter when the conclusion will affect the lawyer's income. A valid claim might be settled too quickly, or a claim with little merit pursued beyond the point of reason. These lapses of judgment can occur in any legal representation, but we cannot say that the pecuniary motivation of the lawyer who solicits a particular representation does not create special problems of conflict of interest.

We need not discuss or evaluate each of these interests in detail as appellant has conceded that the State has a legitimate and indeed "compelling" interest in preventing those aspects of solicitation that involve fraud, undue influence, intimidation, overreaching, and other forms of "vexatious conduct." Brief for Appellant 25. We agree that protection of the public from these aspects of solicitation is a legitimate and important state interest.

## III

Appellant's concession that strong state interests justify regulation to prevent the evils he enumerates would end this case but for his insistence that none of those evils was found to be present in his acts of solicitation. He challenges what he characterizes as the "indiscriminate application" of the Rules to him and thus attacks the validity of DR 2-103 (A) and DR 2-104 (A) not facially, but as applied to his acts of solicitation.[20] And because no allegations or findings were

---

[20] To the extent that appellant charges that the Rules prohibit solicitation that is constitutionally protected—as he contends his is—as well as solicitation that is unprotected, his challenge could be characterized as a contention that the Rules are overbroad. But appellant does not rely on the overbreadth doctrine under which a person may challenge a statute that infringes protected speech even if the statute constitutionally might be applied to him. See, e. g., Gooding v. Wilson, 405 U. S. 518, 520-521 (1972); United States v. Robel, 389 U. S. 258, 265-266 (1967); Dombrowski v. Pfister, 380 U. S. 479, 491 (1965); NAACP v. Button, 371 U. S. 415, 432-433 (1963); Kunz v. New York, 340 U. S. 290 (1951). See generally Note, The First Amendment Overbreadth Doctrine, 83 Harv. L. Rev. 844 (1970). On the contrary, appellant maintains that DR 2-103 (A) and 2-104 (A) could not constitutionally be applied to him.

Nor could appellant make a successful overbreadth argument in view of the Court's observation in Bates that "the justification for the application of overbreadth analysis applies weakly, if at all, in the ordinary commercial context." 433 U. S., at 380. Commercial speech is not as likely to be deterred as noncommercial speech, and therefore does not require the added protection afforded by the overbreadth approach.

Even if the commercial speaker could mount an overbreadth attack, "where conduct and not merely speech is involved, . . . the overbreadth

made of the specific wrongs appellant concedes would justify disciplinary action, appellant terms his solicitation "pure," meaning "soliciting and obtaining agreements from Carol McClintock and Wanda Lou Holbert to represent each of them," without more. Appellant therefore argues that we must decide whether a State may discipline him for solicitation *per se* without offending the First and Fourteenth Amendments.

We agree that the appropriate focus is on appellant's conduct. And, as appellant urges, we must undertake an independent review of the record to determine whether that conduct was constitutionally protected. *Edwards* v. *South*

---

of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick* v. *Oklahoma,* 413 U. S. 601, 615 (1973). The Disciplinary Rules here at issue are addressed to the problem of a particular kind of commercial solicitation and are applied in the main in that context. Indeed, the Bar historically has characterized impermissible solicitation as that undertaken for purposes of the attorney's pecuniary gain and as not including offers of service to indigents without charge. Compare American Bar Association, Committee on Professional Ethics and Grievances, Formal Opinion 148 (1935), with Formal Opinion 169 (1937); see H. Drinker, Legal Ethics 219 (1953). See also *NAACP* v. *Button, supra,* at 440 n. 19. Solicitation has been defined in terms of the presence of the pecuniary motivation of the lawyer, see *People ex rel. Chicago Bar Assn.* v. *Edelson,* 313 Ill. 601, 610–611, 145 N. E. 246, 249 (1924); Note, Advertising, Solicitation and Legal Ethics, 7 Vand. L. Rev. 677, 687 (1954), and ABA Formal Opinion 148 states that the ban on solicitation "was never aimed at a situation . . . in which a group of lawyers announce that they are willing to devote some of their time and energy to the interests of indigent citizens whose constitutional rights are believed to be infringed." We hold today in *Primus* that a lawyer who engages in solicitation as a form of protected political association generally may not be disciplined without proof of actual wrongdoing that the State constitutionally may proscribe. As these Disciplinary Rules thus can be expected to operate primarily if not exclusively in the context of commercial activity by lawyers, the potential effect on protected, noncommercial speech is speculative. See *Broadrick, supra,* at 612, 615. See also Note, 83 Harv. L. Rev., *supra,* at 882–884, 908–910.

*Carolina,* 372 U. S. 229, 235 (1963).[21]  But appellant errs in assuming that the constitutional validity of the judgment below depends on proof that his conduct constituted actual overreaching or inflicted some specific injury on Wanda Holbert or Carol McClintock.  His assumption flows from the premise that nothing less than actual proved harm to the solicited individual would be a sufficiently important state interest to justify disciplining the attorney who solicits employment in person for pecuniary gain.

Appellant's argument misconceives the nature of the State's interest.  The Rules prohibiting solicitation are prophylactic measures whose objective is the prevention of harm before it occurs.  The Rules were applied in this case to discipline a lawyer for soliciting employment for pecuniary gain under circumstances likely to result in the adverse consequences the State seeks to avert.  In such a situation, which is inherently conducive to overreaching and other forms of misconduct, the State has a strong interest in adopting and enforcing rules of conduct designed to protect the public from harmful solicitation by lawyers whom it has licensed.

The State's perception of the potential for harm in circumstances such as those presented in this case is well founded.[22] The detrimental aspects of face-to-face selling even of ordinary consumer products have been recognized and addressed by the Federal Trade Commission,[23] and it hardly need be said that

---

[21] See also *Time, Inc.* v. *Pape,* 401 U. S. 279, 284 (1971); *Jacobellis* v. *Ohio,* 378 U. S. 184, 189 (1964); *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 285 (1964); *Napue* v. *Illinois,* 360 U. S. 264, 271–272 (1959).

[22] Although our concern in this case is with solicitation by the lawyer himself, solicitation by a lawyer's agents or runners would present similar problems.

[23] The Federal Trade Commission has identified and sought to regulate the abuses inherent in the direct-selling industry.  See 37 Fed. Reg. 22934, 22937 (1972).  See also Project: The Direct Selling Industry: An Empirical Study, 16 UCLA L. Rev. 883, 895–922 (1969).  Quoted in

the potential for overreaching is significantly greater when a lawyer, a professional trained in the art of persuasion, personally solicits an unsophisticated, injured, or distressed lay person.[24]   Such an individual may place his trust in a lawyer, regardless of the latter's qualifications or the individual's actual need for legal representation, simply in response to persuasion under circumstances conducive to uninformed acquiescence.   Although it is argued that personal solicitation is valuable because it may apprise a victim of misfortune of his legal rights, the very plight of that person not only makes him more vulnerable to influence but also may make advice all the more intrusive.   Thus, under these adverse conditions the overtures of an uninvited lawyer may distress the solicited individual simply because of their obtrusiveness and the invasion of the individual's privacy,[25] even when no other harm

the FTC report is an observation by the National Consumer Law Center that " '[t]he door to door selling technique strips from the consumer one of the fundamentals in his role as an informed purchaser, the decision as to when, where, and how he will present himself to the marketplace . . . .' "   37 Fed. Reg., at 22939 n. 44.

[24] Most lay persons are unfamiliar with the law, with how legal services normally are procured, and with typical arrangements between lawyer and client.   To be sure, the same might be said about the lay person who seeks out a lawyer for the first time.   But the critical distinction is that in the latter situation the prospective client has made an initial choice of a lawyer at least for purposes of a consultation; has chosen the time to seek legal advice; has had a prior opportunity to confer with family, friends, or a public or private referral agency; and has chosen whether to consult with the lawyer alone or accompanied.

[25] Unlike the reader of an advertisement, who can "effectively avoid further bombardment of [his] sensibilities simply by averting [his] eyes," *Cohen* v. *California*, 403 U. S., at 21, quoted in *Erznoznik* v. *Jacksonville*, 422 U. S. 205, 211 (1975); *Lehman* v. *Shaker Heights*, 418 U. S. 298, 320 (1974) (BRENNAN, J., dissenting), the target of the solicitation may have difficulty avoiding being importuned and distressed even if the lawyer seeking employment is entirely well meaning.   Cf. *Breard* v. *Alexandria*, 341 U. S. 622 (1951).

materializes.[26]   Under such circumstances, it is not unreasonable for the State to presume that in-person solicitation by lawyers more often than not will be injurious to the person solicited.[27]

The efficacy of the State's effort to prevent such harm to prospective clients would be substantially diminished if, having proved a solicitation in circumstances like those of this case, the State were required in addition to prove actual injury. Unlike the advertising in *Bates,* in-person solicitation is not visible or otherwise open to public scrutiny.   Often there is no witness other than the lawyer and the lay person whom he has solicited, rendering it difficult or impossible to obtain reliable proof of what actually took place.   This would be especially true if the lay person were so distressed at the time of the solicitation that he could not recall specific details at a later date.   If appellant's view were sustained, in-person solicitation would be virtually immune to effective oversight and regulation by the State or by the legal profession,[28] in

---

[26] By allowing a lawyer to accept employment after he has given unsolicited legal advice to a close friend, relative, or former client, DR 2–104 (A)(1) recognizes an exception for activity that is not likely to present these problems.

[27] Indeed, appellant concedes that certain types of in-person solicitation are inherently injurious.   His brief states that "solicitation that is superimposed upon the physically or mentally ill patient, or upon an accident victim unable to manage his legal affairs, obviously injures the best interests of such a client."   Brief for Appellant 32.

[28] The problems of affording adequate protection of the public against the potential for overreaching evidenced by this case should not be minimized. The organized bars, operating under codes approved by the highest state courts pursuant to statutory authority, have the primary responsibility for assuring compliance with professional ethics and standards by the more than 400,000 lawyers licensed by the States.   The means employed usually are disciplinary proceedings initially conducted by voluntary bar committees, subject to judicial review.   A study of the problems of enforcing the codes of professional conduct, chaired by then retired Justice Tom C. Clark, reveals the difficulties and complexities—and the inadequacy—of

contravention of the State's strong interest in regulating members of the Bar in an effective, objective, and self-enforcing manner. It therefore is not unreasonable, or violative of the Constitution, for a State to respond with what in effect is a prophylactic rule.[29]

On the basis of the undisputed facts of record, we conclude that the Disciplinary Rules constitutionally could be applied to appellant. He approached two young accident victims at a time when they were especially incapable of making informed judgments or of assessing and protecting their own interests. He solicited Carol McClintock in a hospital room where she lay in traction and sought out Wanda Lou Holbert on the day she came home from the hospital, knowing from his prior inquiries that she had just been released. Appellant urged his services upon the young women and used the information he had obtained from the McClintocks, and the fact of his agreement with Carol, to induce Wanda to say "O. K." in response to his solicitation. He employed a concealed tape recorder, seemingly to insure that he would have evidence of Wanda's oral assent to the representation. He emphasized that his fee would come out of the recovery, thereby tempting the young women with what sounded like a cost-free and therefore irresistible offer. He refused to withdraw when Mrs. Holbert requested him to do so only a day after the initial meeting between appellant and Wanda Lou and continued to represent himself to the insurance company as Wanda Holbert's lawyer.

The court below did not hold that these or other facts were

---

disciplinary enforcement. See ABA, Special Committee on Evaluation of Disciplinary Enforcement, Problems and Recommendations in Disciplinary Enforcement (1970). No problem is more intractable than that of prescribing and enforcing standards with respect to in-person private solicitation.

[29] Even commentators who have advocated modification of the disciplinary rules to allow some solicitation recognize the clear potential for unethical conduct or exploitation of lay persons in certain contexts and recommend that solicitation under such circumstances continue to be proscribed. Note, 81 Yale L. J., supra, n. 11, at 1199.

proof of actual harm to Wanda Holbert or Carol McClintock but rested on the conclusion that appellant had engaged in the general misconduct proscribed by the Disciplinary Rules. Under our view of the State's interest in averting harm by prohibiting solicitation in circumstances where it is likely to occur, the absence of explicit proof or findings of harm or injury is immaterial. The facts in this case present a striking example of the potential for overreaching that is inherent in a lawyer's in-person solicitation of professional employment. They also demonstrate the need for prophylactic regulation in furtherance of the State's interest in protecting the lay public. We hold that the application of DR 2–103 (A) and 2–104 (A) to appellant does not offend the Constitution.

Accordingly, the judgment of the Supreme Court of Ohio is

*Affirmed.*

MR. JUSTICE BRENNAN took no part in the consideration or decision of this case.

MR. JUSTICE MARSHALL, concurring in part and concurring in the judgment.*

I agree with the majority that the factual circumstances presented by appellant Ohralik's conduct "pose dangers that the State has a right to prevent," *ante,* at 449, and accordingly that he may constitutionally be disciplined by the disciplinary Board and the Ohio Supreme Court. I further agree that appellant Primus' activity in advising a Medicaid patient who had been sterilized that the American Civil Liberties Union (ACLU) would be willing to represent her without fee in a lawsuit against the doctor and the hospital was constitutionally protected and could not form the basis for disciplinary proceedings. I write separately to highlight what I believe these cases do and do not decide, and to express my concern

---

*[This opinion applies also to No. 77–56, *In re Primus, ante,* p. 412.]

that disciplinary rules not be utilized to obstruct the distribution of legal services to all those in need of them.

## I

While both of these cases involve application of rules prohibiting attorneys from soliciting business, they could hardly have arisen in more disparate factual settings. The circumstances in which appellant Ohralik initially approached his two clients provide classic examples of "ambulance chasing," fraught with obvious potential for misrepresentation and overreaching. Ohralik, an experienced lawyer in practice for over 25 years, approached two 18-year-old women shortly after they had been in a traumatic car accident. One was in traction in a hospital room; the other had just been released following nearly two weeks of hospital care. Both were in pain and may have been on medication; neither had more than a high school education. Certainly these facts alone would have cautioned hesitation in pressing one's employment on either of these women; any lawyer of ordinary prudence should have carefully considered whether the person was in an appropriate condition to make a decision about legal counsel. See Note, Advertising, Solicitation and the Profession's Duty to Make Legal Counsel Available, 81 Yale L. J. 1181, 1199 (1972).

But appellant not only foisted himself upon these clients; he acted in gross disregard for their privacy by covertly recording, without their consent or knowledge, his conversations with Wanda Lou Holbert and Carol McClintock's family. This conduct, which appellant has never disputed, is itself completely inconsistent with an attorney's fiduciary obligation fairly and fully to disclose to clients his activities affecting their interests. See American Bar Association, Code of Professional Responsibility, Ethical Considerations 4–1, 4–5. And appellant's unethical conduct was further compounded by his pursuing Wanda Lou Holbert, when her interests were clearly

in potential conflict with those of his prior-retained client, Carol McClintock. See *ante,* at 451.[1]

What is objectionable about Ohralik's behavior here is not so much that he solicited business for himself, but rather the circumstances in which he performed that solicitation and the means by which he accomplished it. Appropriately, the Court's actual holding in *Ohralik* is a limited one: that the solicitation of business, under circumstances—such as those found in this record—presenting substantial dangers of harm to society or the client independent of the solicitation itself, may constitutionally be prohibited by the State. In this much of the Court's opinion in *Ohralik,* I join fully.

## II

The facts in *Primus,* by contrast, show a "solicitation" of employment in accordance with the highest standards of the legal profession. Appellant in this case was acting, not for her own pecuniary benefit, but to promote what she perceived to be the legal rights of persons not likely to appreciate or to be able to vindicate their own rights. The obligation of all lawyers, whether or not members of an association committed to a particular point of view, to see that legal aid is available "where the litigant is in need of assistance, or where important issues are involved in the case," has long been established. *In re Ades,* 6 F. Supp. 467, 475 (Md. 1934); see *NAACP v. Button,* 371 U. S. 415, 440 n. 19 (1963). Indeed, Judge Soper in *Ades* was able to recite numerous instances in which lawyers, including Alexander Hamilton, Luther Martin, and Clarence Darrow, volunteered their services in aid of indigent persons or important public issues. 6 F. Supp., at 475–476. The American Bar Association Code of Professional Responsibility itself recognizes that the "responsibility for providing

---

[1] Appellant's advice to Wanda Lou Holbert that she could get money from the McClintocks' insurance policy created the risk that the financial interests of his two clients would come into conflict.

legal services for those unable to pay ultimately rests upon the individual lawyer," and further states that "[e]very lawyer, regardless of professional prominence or professional workload, should find time to participate in serving the disadvantaged." [2]

In light of this long tradition of public interest representation by lawyer volunteers, I share my Brother BLACKMUN's concern with respect to Part VI of the Court's opinion, and believe that the Court has engaged in unnecessary and unfortunate dicta therein. It would be most undesirable to discourage lawyers—so many of whom find time to work only for those clients who can pay their fees—from continuing to volunteer their services in appropriate cases. Moreover, it cannot be too strongly emphasized that, where "political expression and association" are involved, *ante,* at 438, "a State may not, under the guise of prohibiting professional misconduct, ignore constitutional rights." *NAACP* v. *Button, supra,* at 439. For these reasons, I find particularly troubling the Court's dictum that "a State may insist that lawyers not solicit on behalf of lay organizations that exert control over the actual conduct of any ensuing litigation." *Ante,* at 439. This proposition is by no means self-evident, has never been the actual holding of this Court, and is not put in issue by the facts presently before us. Thus, while I agree with much of the Court's opinion in *Primus,* I cannot join in the first paragraph of Part VI.

## III

Our holdings today deal only with situations at opposite poles of the problem of attorney solicitation. In their aftermath, courts and professional associations may reasonably be

---

[2] EC 2-25. The Disciplinary Rules of the Code, moreover, while generally forbidding a lawyer from "knowingly assist[ing] a person or organization that furnishes or pays for legal services to others to promote the use of his services," makes an exception for attorney participation in, *inter alia,* legal aid or public defender offices. DR 2-103 (D)(1).

expected to look to these opinions for guidance in redrafting the disciplinary rules that must apply across a spectrum of activities ranging from clearly protected speech to clearly proscribable conduct. A large number of situations falling between the poles represented by the instant facts will doubtless occur. In considering the wisdom and constitutionality of rules directed at such intermediate situations, our fellow members of the Bench and Bar must be guided not only by today's decisions, but also by our decision last Term in *Bates* v. *State Bar of Arizona,* 433 U. S. 350 (1977). There, we held that truthful printed advertising by private practitioners regarding the availability and price of certain legal services was protected by the First Amendment. In that context we rejected many of the general justifications for rules applicable to one intermediate situation not directly addressed by the Court today—the commercial, but otherwise "benign" solicitation of clients by an attorney.[3]

The state bar associations in both of these cases took the position that solicitation itself was an evil that could lawfully be proscribed. See Brief for Appellee in No. 76–1650, p. 17; Brief for Appellee in No. 77–56, p. 19. While the Court's *Primus* opinion does suggest that the only justification for non-solicitation rules is their prophylactic value in preventing such evils as actual fraud, overreaching, deception, and misrepresentation, see *ante,* at 432–433, 437–438, I think it should

---

[3] By "benign" commercial solicitation, I mean solicitation by advice and information that is truthful and that is presented in a noncoercive, nondeceitful, and dignified manner to a potential client who is emotionally and physically capable of making a rational decision either to accept or reject the representation with respect to a legal claim or matter that is not frivolous. Cf. *Louisville Bar Assn.* v. *W. Hubbard,* 282 Ky. 734, 739, 139 S. W. 2d 773, 775 (1940) (attorney may personally solicit business "where he does not take advantage of the ignorance, or weakness, or suffering, or human frailties of the expected clients, and where no inducements are offered them"); see also *Petition of R. Hubbard,* 267 S. W. 2d 743, 744 (Ky. 1954).

be made crystal clear that the State's legitimate interests in this area are limited to prohibiting such substantive evils.

## A

Like rules against advertising, rules against solicitation substantially impede the flow of important information to consumers from those most likely to provide it—the practicing members of the Bar. Many persons with legal problems fail to seek relief through the legal system because they are unaware that they have a legal problem, and, even if they "perceive a need," many "do not obtain counsel . . . because of an inability to locate a competent attorney." *Bates* v. *State Bar of Arizona, supra,* at 370.[4] Notwithstanding the injurious aspects of Ohralik's conduct, even his case illustrates the potentially useful, information-providing aspects of attorney solicitation: Motivated by the desire for pecuniary gain, but informed with the special training and knowledge of an attorney, Ohralik advised both his clients (apparently correctly) that, although they had been injured by an uninsured motorist, they could nonetheless recover on the McClintocks' insurance policy. The provision of such information about legal rights and remedies is an important function, even where the rights and remedies are of a private and commercial nature involving no constitutional or political overtones. See *Mine Workers* v. *Illinois Bar Assn.,* 389 U. S. 217, 221–223 (1967). See also *United Transportation Union* v. *Michigan Bar,* 401 U. S. 576, 585 (1971).

---

[4] As we noted only last Term in *Bates,* there appears to be substantial underutilization of lawyers' services. 433 U. S., at 370–371, nn. 22, 23; see 4 ABA Alternatives 1 (July 1977), summarizing report of ABA Special Committee to Survey Legal Needs. This problem may be especially acute among the middle-class majority of this country, persons too affluent to qualify for government-funded legal services but not wealthy enough to afford the fees of the major law firms that serve mostly corporate clients. See generally B. Christensen, Lawyers for People of Moderate Means (1970).

In view of the similar functions performed by advertising and solicitation by attorneys, I find somewhat disturbing the Court's suggestion in *Ohralik* that in-person solicitation of business, though entitled to some degree of constitutional protection as "commercial speech," is entitled to less protection under the First Amendment than is "the kind of advertising approved in *Bates.*" *Ante,* at 455.[5] The First Amendment informational interests served by solicitation, whether or not it occurs in a purely commercial context, are substantial, and they are entitled to as much protection as the interests we found to be protected in *Bates.*

B

Not only do prohibitions on solicitation interfere with the free flow of information protected by the First Amendment, but by origin and in practice they operate in a discriminatory manner. As we have noted, these constraints developed as rules of "etiquette" and came to rest on the notion that a lawyer's reputation in his community would spread by word of mouth and bring business to the worthy lawyer.[6] *Bates* v.

---

[5] The Court may mean simply that conducting solicitation in person presents somewhat greater dangers that the State may permissibly seek to avoid. See *infra,* at 476–477. But if instead the Court means that different forms of "commercial speech" are generally to be subjected to differing levels of First Amendment scrutiny, I cannot agree. The Court also states that "in-person solicitation of professional employment by a lawyer does not stand on a par with truthful advertising about the availability and terms of routine legal services." *Ante,* at 455. The relevant comparison, however, at the least is between *truthful* in-person solicitation of employment and truthful advertising.

[6] The Court's opinion in *Bates* persuasively demonstrated the lack of basis for concluding that advertising by attorneys would demean the profession, increase the incidence of fraudulent or deceptive behavior by attorneys, or otherwise harm the consumers of legal services. It is interesting in this connection to note that for many years even those in favor of the rules against solicitation by attorneys agreed that solicita-

*State Bar of Arizona, supra,* at 371–372, 374–375, n. 30; see *ante,* at 460–461. The social model on which this conception depends is that of the small, cohesive, and homogeneous community; the anachronistic nature of this model has long been recognized. See, *e. g.,* B. Christensen, Lawyers for People of Moderate Means 128–134 (1970); Note, 81 Yale L. J., at 1202–1203; Garrison, The Legal Profession and the Public, 1 Nat. Law. Guild Q. 127–128 (1938). If ever this conception were more generally true, it is now valid only with respect to those persons who move in the relatively elite social and educational circles in which knowledge about legal problems, legal remedies, and lawyers is widely shared. Christensen, *supra,* at 130; Note, 81 Yale L. J., at 1203. See also Comment, A Critical Analysis of Rules Against Solicitation by Lawyers, 25 U. Chi. L. Rev. 674, 684 (1958).

The impact of the nonsolicitation rules, moreover, is discriminatory with respect to the suppliers as well as the consumers of legal services. Just as the persons who suffer most from lack of knowledge about lawyers' availability belong to the less privileged classes of society, see *supra,* at 473, and n. 4, so the Disciplinary Rules against solicitation fall most heavily on those attorneys engaged in a single-practitioner or small-partnership form of practice [7]—attorneys who typically earn less than their fellow practitioners in larger, corporate-oriented firms. See Shuchman, Ethics and Legal Ethics: The

---

tion was not *"malum in se."* H. Drinker, Legal Ethics 211 n. 3 (1953). Dr. Johnson, a venerable commentator on mores of all sorts, expressed well the prevailing view of the profession when he stated: "I should not solicit employment as a lawyer—not because I should think it wrong, but because I should disdain it." Quoted in R. Pound, The Lawyer from Antiquity to Modern Times 12 n. 3 (1953). As *Bates* made clear, "disdain" is an inadequate basis on which to restrict the flow of information otherwise protected by the First Amendment.

[7] According to the American Bar Foundation, 72.7% of all lawyers were in private practice in 1970; of these, over half practiced as individual practitioners. The 1971 Lawyer Statistical Report 10 (1972).

Propriety of the Canons as a Group Moral Code, 37 Geo. Wash. L. Rev. 244, 255–266, and n. 77 (1968); Note, 81 Yale L. J., at 1204–1208; see also Garrison, *supra,* at 130. Indeed, some scholars have suggested that the rules against solicitation were developed by the professional bar to keep recently immigrated lawyers, who gravitated toward the smaller, personal injury practice, from effective entry into the profession. See J. Auerbach, Unequal Justice 42–62, 126–129 (1976). In light of this history, I am less inclined than the majority appears to be, *ante,* at 460–461, to weigh favorably in the balance of the State's interests here the longevity of the ban on attorney solicitation.

## C

By discussing the origin and impact of the nonsolicitation rules, I do not mean to belittle those obviously substantial interests that the State has in regulating attorneys to protect the public from fraud, deceit, misrepresentation, overreaching, undue influence, and invasions of privacy. But where honest, unpressured "commercial" solicitation is involved—a situation not presented in either of these cases—I believe it is open to doubt whether the State's interests are sufficiently compelling to warrant the restriction on the free flow of information which results from a sweeping nonsolicitation rule and against which the First Amendment ordinarily protects. While the State's interest in regulating in-person solicitation may, for reasons explained *ante,* at 457–458, 460–462, be somewhat greater than its interest in regulating printed advertisements, these concededly legitimate interests might well be served by more specific and less restrictive rules than a total ban on pecuniary solicitation. For example, the Justice Department has suggested that the disciplinary rules be reworded "so as to *permit* all solicitation and advertising except the kinds that are false, misleading, undignified, or champertous." [8]

---

[8] Remarks of L. Bernstein, Chief, Special Litigation Section, Antitrust Division, Department of Justice, reprinted in 5 CCH Trade Reg. Rep.

To the extent that in-person solicitation of business may constitutionally be subjected to more substantial state regulation as to time, place, and manner than printed advertising of legal services, it is not because such solicitation has "traditionally" been banned, nor because one form of commercial speech is of less value than another under the First Amendment. Rather, any additional restrictions can be justified only to the degree that dangers which the State has a right to prevent are actually presented by conduct attendant to such speech, thus increasing the relative "strength of the State's countervailing interest in prohibition," *ante,* at 455. As the majority notes, and I wholeheartedly agree, these dangers are amply present in the *Ohralik* case.

Accordingly, while I concur in the judgments of the Court in both of these cases, I join in the Court's opinions only to the extent and with the exceptions noted above.

MR. JUSTICE REHNQUIST, concurring in the judgment.

For the reasons stated in my dissenting opinion in *In re Primus, ante,* p. 440, I concur in the affirmance of the judgment of the Supreme Court of Ohio.

---

¶ 50,197 (1974) (emphasis added). In addition, at least one bar association has recently considered proposals to eliminate its current prohibitions on solicitation and instead to prohibit false and misleading statements and the solicitation of clients who have given adequate notice that they do not want to hear from the lawyer. Petition of the Board of Governors of the District of Columbia Bar for Amendments to Rule X of the Rules Governing the Bar of the District of Columbia, reproduced in App. B to Brief for United States as *Amicus Curiae* in *Bates* v. *State Bar of Arizona,* O. T. 1976, No. 76–316.