STEVE FOWLER, APPELLANT, v. NEBRASKA ACCOUNTABILITY AND DISCLOSURE COMMISSION, APPELLEE.

330 N.W.2d 136

Filed February 4, 1983. No. 81-721.

Kirk E. Naylor, Jr., for appellant.

Bernard Wishnow, NADC General Counsel, for appellee.

KRIVOSHA, C.J., BOSLAUGH, MCCOWN, WHITE, HASTINGS, and CAPORALE, JJ., and COLWELL, D.J., Retired.

HASTINGS, J.

Following a hearing before the Nebraska Accountability and Disclosure Commission, it was determined that the plaintiff, Steve Fowler, had violated the provisions of Neb. Rev. Stat. § 49-14,132 (Reissue 1978), and he was ordered to pay a civil penalty of $100 to the State of Nebraska. He appealed that order, which, after hearing, was affirmed by the District Court. He appeals to this court, assigning as error the unconstitutionality of the statute under the provisions of the first and fourteenth amendments to the Constitution of the United States and the provisions of article I, § 6, of the Constitution of the State of Nebraska.

The Nebraska Political Accountability and Disclosure Act, Neb. Rev. Stat. §§ 49-1401 et seq. (Reissue 1978), contains 138 sections, requiring, among other things, that so-called political action committees file with the commission created by this act a statement reflecting contributions made to any political candidate. § 49-1454. Section 49-14,132 provides in part that "Campaign statements . . . shall not be . . . used by any person for any commercial purpose, for soliciting contributions, ticket sales or other political campaign purposes, or for harassment by a governmental body or any other person." A civil penalty for a violation of this act may be imposed in an amount not exceeding $1,000. § 49-14,126.

During the year 1980 the plaintiff was engaged in a political campaign, seeking reelection as a member of the Nebraska Legislature. One of the issues of that campaign was the amount of contributions to both candidates made by political action committees and the interests which they represented. The plaintiff concedes that he obtained from the records of the Nebraska Accountability and Disclosure Commission certain information relating to contributions made to his opponent's campaign by several political action committees. He then sent a form letter and questionnaire to each of those committees. Gen-

erally, the import of the questionnaire was to ascertain if the decision to support a candidate was approved by the full membership of the organization; whether the decision to support the plaintiff's opponent was based primarily upon a dissatisfaction with the plaintiff's record in the Legislature or a particular interest in his opponent; and whether the decision was based on a particular vote or votes of the plaintiff as a legislator. These letters and questionnaires were mailed to approximately 12 committees.

Apparently only two responses were received by the plaintiff. One committee simply replied that it had filed its report with the commission and therefore felt that it had fully complied with the law. The other response was in considerable detail and seemed to answer the questions submitted. The introductory paragraph of that response was as follows: "Your inquiry and questionnaire addressed to [us] came as a bit of a shock. In fact, it seemed a little like a challenge of our right to support the political candidate of our choice. However, I will assume that it was sincere."

It is on the basis of this activity that the plaintiff was charged with a violation of the statute. Because the written charge and the findings of the commission were couched in general terms, we do not know whether the plaintiff's alleged violation was due to his use of the statement for "other political campaign purposes" or for "harassment."

At the outset, we would observe that little time or effort was devoted by either party in brief or argument to the issue of "other political campaign purposes." *Buckley v. Valeo,* 424 U.S. 1, 96 S. Ct. 612, 46 L. Ed. 2d 659 (1976), is cited by both of them. The essential holding of that case, insofar as it is important to a decision here, is that there may be a substantially compelling public interest in the political process to justify a governmental requirement which compels disclosure of financial contributions

vis-a-vis the first amendment right of free speech.

Interestingly enough, a portion of the Federal Election Campaign Act of 1971 (2 U.S.C. § 438(a)(4) (1976)), which was involved in the litigation in *Buckley,* was similar to § 49-14,132 of the Nebraska Political Accountability and Disclosure Act, and read in part as follows: *"Provided,* That any information copied from such reports and statements shall not be sold or utilized by any person for the purpose of soliciting contributions or for any commercial purpose . . . ." *Id.* at 173.

In commenting on that very section of the Federal Election Campaign Act, the defendant quotes, at 11 in its brief, Federal Election Commission Advisory Opinion 1980-101 in part as follows: '' 'This exception allows for the use of information copied or otherwise obtained from reports filed with the Commission in newspapers, books or the like, but only if the principal purpose of these communications is not to communicate any contributor information for the purpose of soliciting contributions or for other commercial purposes.' '' And at 12 in its brief, defendant quotes Federal Election Commission Advisory Opinion 1980-78 in part as follows: '' 'The focus of the proponents of 2 U.S.C. § 438(a)(4) centers on protecting the privacy of the "very public spirited citizens" who make contributions to campaigns. The principal, if not the sole, purpose of the provision was to protect contributor information lists from being used for commercial purposes.' '' Similar language is found in *Ohralik v. Ohio State Bar Assn.,* 436 U.S. 447, 98 S. Ct. 1912, 56 L. Ed. 2d 444 (1978): "We agree that protection of the public from these aspects of solicitation [fraud, undue influence, intimidation, overreaching, and other forms of 'vexatious conduct'] is a legitimate and important state interest." *Id.* at 462.

*Buckley* goes on to explain the governmental interests sought to be vindicated by the disclosure requirements of the Federal Election Campaign Act:

"First, disclosure provides the electorate with information 'as to where political campaign money comes from and how it is spent by the candidate' in order to aid the voters in evaluating those who seek federal office. It allows voters to place each candidate in the political spectrum more precisely than is often possible solely on the basis of party labels and campaign speeches. The sources of a candidate's financial support also alert the voter to the interests to which a candidate is most likely to be responsive and thus facilitate predictions of future performance in office.

"Second, disclosure requirements deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity. This exposure may discourage those who would use money for improper purposes either before or after the election. A public armed with information about a candidate's most generous supporters is better able to detect any post-election special favors that may be given in return." *Id.* at 66-67.

The purpose of the rather lengthy quotation from *Buckley* is simply to point out that the very objective to be achieved—publicity as to campaign contributions and how they affect the political process—and that which justifies the governmental interest in interfering with first amendment free speech rights, is the very thing which the Nebraska statute seeks to inhibit.

In *Com. v. Wadzinski,* 492 Pa. 35, 422 A.2d 124 (1980), the defendant was convicted of a violation of a statute which required that no candidate for public office shall make a public statement which makes reference to an opposing candidate without providing in advance to that opposing candidate a copy of the proposed statement. In striking down that statute the court said: "From the foregoing, it is readily apparent that the broad sweep of the Section 1614 notice requirement places a substantial burden on

the candidate's ability to engage in protected political discourse. Further, the inhibitory effect of that requirement will in many cases work directly counter to the governmental interest in providing voter access to accurate information about candidates and to robust debate on the issues. In summary, even a cursory look at the statute's probable operation demonstrates that its potential for suppressing vital last-minute political expression is equally as grave as that considered in *Mills v. Alabama, supra*. It follows from *Mills* that since the governmental interest asserted in support of the statute, although a legitimate and important one, is inadequate to justify the substantial burden imposed on protected speech, the statute must fall." 422 A.2d at 132.

We conclude that § 49-14,132, which prohibits the use of public information for "other political campaign purposes," as it was applied in this case, places an impermissible burden on protected speech and must fall as being overbroad. There remains the question of whether or not the term "harassment," as prohibited by the statute, is also constitutionally unacceptable as vague or overbroad.

Webster's Third New International Dictionary, Unabridged (1968) defines "harass" as follows: "2 a : to tire out (as with physical or mental effort) : EXHAUST, FATIGUE . . . b : to vex, trouble, or annoy continually or chronically (as with anxieties, burdens, or misfortune) : PLAGUE, BEDEVIL, BADGER . . . ."

Both parties rely on *Grayned v. City of Rockford,* 408 U.S. 104, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972). An antinoise ordinance, which was challenged on the grounds of vagueness, read in part as follows: " '[N]o person, while on public or private grounds adjacent to any building in which a school or any class thereof is in session, shall willfully make or assist in the making of any noise or diversion which disturbs or tends to disturb the peace or good order of such school session or class thereof. . . .' " *Id.* at 107-08.

Contained in the opinion of Mr. Justice Marshall is an excellent discussion of the ingredients of vagueness. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute 'abut[s] upon sensitive areas of basic First Amendment freedoms,' it 'operates to inhibit the exercise of [those] freedoms.' Uncertain meanings inevitably lead citizens to ' "steer far wider of the unlawful zone" . . . than if the boundaries of the forbidden areas were clearly marked.' " *Id.* at 108-09.

The court then went on to conclude: "Although the question is close, we conclude that the antinoise ordinance is not impermissibly vague. . . . Condemned to the use of words, we can never expect mathematical certainty from our language. The words of the Rockford ordinance are marked by 'flexibility and reasonable breadth, rather than meticulous specificity,' [citation omitted] but we think it is clear what the ordinance as a whole prohibits. Designed, according to its preamble, 'for the protection of Schools,' the ordinance forbids deliberately noisy or diversionary activity that disrupts or is about to disrupt normal school activities. It forbids this willful activity at fixed times—when school is in session—and at a sufficiently fixed place

—'adjacent' to the school. Were we left with just the words of the ordinance, we might be troubled by the imprecision of the phrase 'tends to disturb.' However, in *Chicago v. Meyer* . . . [citation omitted] the Supreme Court of Illinois construed a Chicago ordinance prohibiting, *inter alia,* a 'diversion tending to disturb the peace,' and held that it permitted conviction only where there was '*imminent* threat of violence.' " (Emphasis in original.) *Id.* at 109-11.

Interestingly enough, in the instant case, the definition of harassment apparently was delegated to supposed victims "for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." In the defendant Nebraska Accountability and Disclosure Commission's brief, the only suggestion of a standard to determine the meaning of harassment was a statement that "As shown by NADC Ex. 4, ¶¶ 5 to 9, and as found by the Commission and the District Court, the recipients of the letter and questionnaire were 'harassed.' " In other words, "harassment" was present because someone felt "harassed." Defendant obviously has reference to that portion of the letter quoted earlier in which the author said, "Your inquiry . . . came as a bit of a shock," and to the fact that other recipients of the letter discussed what should be done about it.

However, such a contention is completely answered by the case of *Coates v. City of Cincinnati,* 402 U.S. 611, 91 S. Ct. 1686, 29 L. Ed. 2d 214 (1971). The ordinance in question there made it a criminal offense for " 'three or more persons to assemble . . . on any of the sidewalks . . . and there conduct themselves in a manner annoying to persons passing by . . . .' " *Id.* at 611. The Ohio Supreme Court, in upholding the validity of the ordinance, said that " 'The word "annoying" is a widely used and well understood word; it is not necessary to guess its meaning. "Annoying" is the present participle of the transitive verb "annoy" which means to trouble,

to vex, to impede, to incommode, to provoke, to *harass* or to irritate.' '' (Emphasis supplied.) *Id.* at 612.

However, the Supreme Court of the United States struck down the ordinance. In pointing out the limited construction placed on the ordinance by the Ohio court, the opinion went on to state: "But the court did not indicate upon whose sensitivity a violation does depend—the sensitivity of the judge or jury, the sensitivity of the arresting officer, or the sensitivity of a hypothetical reasonable man.

"We are thus relegated, at best, to the words of the ordinance itself. . . . In our opinion this ordinance is unconstitutionally vague because it subjects the exercise of the right ot assembly to an unascertainable standard, and unconstitutionally broad because it authorizes the punishment of constitutionally protected conduct.

"Conduct that annoys some people does not annoy others. Thus, the ordinance is vague, not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all. As a result, 'men of common intelligence must necessarily guess at its meaning.' [Citation omitted.]" *Id.* at 613-14.

On the basis of the foregoing reasoning, we find that the statute in question is both unconstitutionally vague and overbroad. Consequently, the judgment of the District Court is reversed and the action ordered dismissed.

REVERSED AND DISMISSED.