In the Matter of ALFRED S. KOFFLER and WILLIAM HENRY HARRISON, JR., Attorneys, Respondents. JOINT BAR ASSOCIATION GRIEVANCE COMMITTEE FOR THE TENTH JUDICIAL DISTRICT, Petitioner.

Second Department, October 1, 1979

## APPEARANCES OF COUNSEL

*Francis F. Doran (Louis J. Profera* and *Grace D. Moran* of counsel), for petitioner.

*Clark Wulf Levine & Peratis (Melvin L. Wulf* and *Thomas P. Kerrigan* of counsel), for respondents.

## OPINION OF THE COURT

SHAPIRO, J.

■ We today hold that an attorney's mailing of letters to individuals identified as prospective clients and to real estate brokers for the purpose of establishing an attorney-client relationship and soliciting a retainer in the identified transaction for the attorney's pecuniary gain, exceeds the bounds of permissible commercial speech and is properly proscribed by section 479 of the Judiciary Law (which makes unlawful the "solicit[ing] either directly or indirectly [of] legal business") and DR 2-103 (A) of the Code of Professional Responsibility (which essentially is a duplicate of the statute), as adopted by the New York State Bar Association.[1]

### THE FACTS

In August, 1977 respondent attorney Harrison placed an advertisement in the real estate section of *Newsday,* a daily newspaper of large circulation in Suffolk, Nassau and Queens Counties. In substance it stated that the legal fee of respondent Harrison for real estate closings, including contracts, was $235 and it listed the telephone numbers at which he could be reached.

On August 24, 1977 and thereafter, the law firm of respondents Koffler and Harrison mailed letters to homeowners *and real estate brokers.* The letter to the homeowners was headed by a reproduced copy of the advertisement. It then stated:

"Dear Homeonwer *[sic]:*

"The advertisement shown above is being run by our office in 'Newsday's' real estate section.

---

1. We do not include in this interdiction solicitation activities by or on behalf of organizations such as the NAACP or ACLU which involve collective activity to obtain meaningful access to the courts (see *Matter of Primus,* 436 US 412) or by labor unions or similar organizations seeking to provide low-cost legal representation to their members (see *Railroad Trainmen v Virginia Bar,* 377 US 1; *United Mine Workers v Illinois Bar Assn.,* 389 US 217; *Matter of Primus, supra,* p 426).

"We understand that you are selling your home and we would like to take this opportunity to inform you that because we are now allowed to advertise our services YOU no longer need to pay $400.00 to $600.00 for legal representation when you close title.

"IN FACT, BECAUSE WE ARE ABLE TO CONTACT YOU BY DIRECT MAIL, WE ARE WILLING TO TRANSACT AND REPRESENT YOU AT THE SALE OF YOUR PROPERTY FOR $195.00.

"Feel free to contact us if you have any questions.

"If you wish, you may make an appointment with us prior to selling your house. This will enable us to draw your contracts quickly when you and a purchaser come to terms.

"Enclosed you will find our business card. We look forward to representing you."

The letter to the real estate brokers was also headed by a reproduced copy of the advertisement and stated:

"Dear Broker:

"The advertisement shown above is being run by our office in 'Newsday.'

"We think you will agree that the fee of $235.00 is very competitive, NEVERTHELESS, WE ARE NOW HAPPY TO ADVISE THAT OUR FEE TO ALL BROKER-REFERRED CLIENTS WILL BE $195.00, REGARDLESS OF THE PURCHASE PRICE OF THE PROPERTY.

"We are proud that we are able to decrease the cost of this aspect of home-ownership at a time when Long Islanders are finding it increasingly expensive and difficult in many ways to own their own home.

"Enclosed are two of our business cards. Our principal office is at 670 Main Street, Islip, New York, however, we also have facilities at 61 Randall Road, Shoreham. We can be contacted in Islip at 581-6000 during normal business hours or in Shoreham at 744-4444 after 9:00 P.M. and on weekends.

"We look forward to assisting you by assisting your clients."

Between August 24 and October 24, 1977, respondents mailed approximately 7,500 such letters to homeowners and several hundred such letters to real estate brokers. Notwithstanding the fact that the letters to the homeowners stated that respondents "understand that you are selling your home", the record does not indicate how they had obtained that information, or whether, in fact, they *had* such information.

On September 15, 1977 the Joint Bar Association Grievance Committee for the Tenth Judicial District (the committee) wrote to respondents, enclosing copies of the two letters, and invited them to submit their comments thereon. On September 23, 1977 respondents acknowledged that they had sent the letters and stated that "We have endeavored to avoid that which is prohibited by the recent Supreme Court decision on advertising by lawyers." By order dated February 8, 1978, this court authorized the institution of a disciplinary proceeding. The committee initiated the proceeding by a notice of petition dated April 7, 1978. The petition alleged that respondents were "guilty of illegal and unethical practices and professional misconduct" because of their "numerous direct solicitations for legal clients in violation of the Code of Professional Responsibility as adopted by the New York State Bar Association and Section 479 of the Judiciary Law".

Respondents' answer attacked the constitutionality of the statute and rule insofar as they applied to mail solicitations. It also alleged as an affirmative defense that "[i]n preparing and mailing the letters * * * the respondents relied in good faith upon the decision of the United States Supreme Court in *Bates v State Bar of Arizona,* 433 US 350". Their answer also asserted that the letters were "in full compliance with the guidelines for advertising adopted by the New York State Bar Association and approved by the Appellate Division Second Department".

This court referred the proceeding to Honorable JOHN F. SCILEPPI, a retired Judge of the Court of Appeals, to hear and to report upon the issues thus raised. At the hearing respondent Koffler testified that based on the June 27, 1977 holding in *Bates (supra),* respondents inserted the afore-mentioned advertisements, but that "[t]he results were negligible * * * We felt that if we could direct our advertising specifically at the person who was interested in the sale of a house,—for example, instead of just advertising in a paper with a general circulation—we might be able to get better results and do the mass production idea that we had." He admitted that they had mailed out the two letters.

### THE REFEREE'S FINDINGS

On April 11, 1979 the Referee submitted his report which concluded that the respondents' conduct violated the afore-stated statute and section of the Code of Professional Respon-

sibility "not because they communicated with prospective clients by mail, but because the content of that communication did not comply with the standards of the Code of Professional Responsibility, and constituted solicitation rather than advertising." The petitioner has moved to confirm the report of the Referee.

THE LAW

I

### The application of the First Amendment to "commercial speech" under the pre-1976 decisions of the United States Supreme Court

In *Valentine v Chrestensen* (316 US 52) the court decided that the First Amendment was not violated by a municipal ordinance which forbade street distribution of handbills bearing commercial advertising matter. It differentiated between the banning of *all* communication by handbills in the streets and the banning of "purely commercial advertising" *(supra, p 54)*.

*Breard v Alexandria* (341 US 622, 642) upheld an ordinance prohibiting door-to-door solicitation of magazine subscriptions because "[t]he selling * * * brings into the transaction a commercial feature." The court distinguished *Martin v Struthers* (319 US 141), where it had held that the First Amendment permitted door-to-door distribution of leaflets publicizing a religious meeting, saying that in such a situation there was "no element of the commercial" *(Breard v Alexandria, supra, p 643)*.

In *New York Times Co. v Sullivan* (376 US 254), the court stated that the advertisement, alleged to be libelous, was not "purely commercial", and gave that as one of the reasons for holding that it was protected by the First Amendment.

However, in *Virginia Pharmacy Bd. v Virginia Consumer Council* (425 US 748, 759, discussed more fully at II, *infra)* the Supreme Court of the United States pointed out that since its 1951 decision in *Breard* "the Court has never *denied* protection on the ground that the speech in issue was 'commercial speech'." The court then stated (p 759): "That simplistic approach, which by then had come under criticism or was regarded as of doubtful validity by Members of the Court, was avoided in *Pittsburgh Press Co. v Human Relations Comm'n,*

413 US 376 (1973). There the Court upheld an ordinance prohibiting newspapers from listing employment advertisements in columns according to whether male or female employees were sought to be hired. The Court, to be sure, characterized the advertisements as 'classic examples of commercial speech,' *id.,* at 385, and a newspaper's printing of the advertisements as of the same characters. The Court, however, upheld the ordinance on the ground that the restriction it imposed was permissible because the discriminatory hirings proposed by the advertisements, and by their newspaper layout, were themselves illegal."

It then noted (p 759) that by its previous decision in *Bigelow v Virginia* (421 US 809), it determined that "the notion of unprotected 'commercial speech' all but passed from the scene." In *Bigelow,* the defendant printed an advertisement in his newspaper as to the availability of abortions in New York in the face of a Virginia statute that made the circulation of any publication to encourage the processing of an abortion a misdemeanor. The State of Virginia alleged that the publication was not protected by the First Amendment because it dealt with a commercial matter (i.e., the fee for an abortion). The *Bigelow* court questioned the continued validity of *Valentine v Chrestensen* (316 US 52, *supra)* and stated (p 819) that the holding in that case was a "distinctly * * * limited one" relating to "a reasonable regulation of the *manner* in which commercial advertising could be distributed" (emphasis supplied). The *Bigelow* court held that it was not true that advertising, as such, was entitled to no First Amendment protection at all and stated (p 826) that the "relationship of speech to the marketplace of products or of services does not make it valueless in the marketplace of ideas".

The court pertinently noted however (p 825): "We need not decide in this case the precise extent to which the First Amendment permits regulation of advertising that is related to activities the State may legitimately regulate or even prohibit."

II

Virginia Pharmacy Bd. v Virginia Consumer
Council, 425 US 748 (1976)

The court in *Virginia Pharmacy Bd.* held unconstitutional a Virginia statute declaring it to be unprofessional conduct for a

licensed pharmacist to advertise the prices of prescription drugs.

Reviewing its previous decisions in this field (discussed in Part I, *supra),* the court stated (p 758) that "[t]here can be no question that in past decisions the Court has given some indication that commercial speech is unprotected." It then noted (p 759) that that concept had "all but passed from the scene" by its decision in *Bigelow.*

The court in *Virginia Pharmacy Bd.* then stated (pp 760-761): "Here * * * the question whether there is a First Amendment exception for 'commercial speech' is squarely before us. Our pharmacist does not wish to editorialize on any subject, cultural, philosophical, or political * * * The 'idea' he wishes to communicate is simply this: 'I will sell you the X prescription drug at the Y price.' Our question, then, is whether this communication is wholly outside the protection of the First Amendment."

The court answered the question which it thus posed by concluding (pp 764-765) that society has "a strong interest in the free flow of commercial information. Even an individual advertisement, though entirely 'commercial,' may be of general public interest * * * Advertising, however tasteless and excessive it sometimes may seem, is nonetheless dissemination of information as to who is producing and selling what product, for what reason, and at what price * * * [T]he allocation of our resources in large measure will be made through numerous private economic decisions. It is a matter of public interest that those decisions, in the aggregate, be intelligent and well-informed. To this end, the free flow of commercial information is indispensable * * * Therefore, even if the First Amendment were thought to be primarily an instrument to enlighten public decisionmaking in a democracy, we could not say that the free flow of information does not serve that goal."

The court answered Virginia's justification for banning the advertising by stating (p 769) that "on close inspection it is seen that the State's protectiveness of its citizens rests in large measure on the advantages of their being kept in ignorance" and (p 770) on the assumption that it would be in the best interest of the public "if they are not permitted to know who is charging what." The court said (p 770) that "[i]t is precisely this kind of choice, between the dangers of suppressing information, and the dangers of its misuse if it is freely available, that the First Amendment makes for us.

Virginia is free to require whatever professional standards it wishes of its pharmacists * * * But it may not do so by keeping the public in ignorance of the entirely lawful terms that competing pharmacists are offering."

The court then stated (pp 770-773): "In concluding that commercial speech, like other varieties, is protected, *we of course do not hold that it can never be regulated in any way. Some forms of commercial speech regulation are surely permissible* * * * There is no claim, for example, that the prohibition on prescription drug price advertising is a mere time, place, and *manner* restriction. We have often approved restrictions of that kind provided that they are justified without reference to the content of the regulated speech, that they serve a significant governmental interest, and that in so doing *they leave open ample alternative channels for communication of the information* * * * Whatever may be the proper bounds of time, place, and *manner* restrictions on commercial speech, they are plainly exceeded by this Virginia statute, which singles out speech of a particular content and seeks to prevent its dissemination *completely* * * * What is at issue is whether a State may *completely* suppress the dissemination of concededly truthful information about entirely lawful activity, fearful of that information's effect upon its disseminators and its recipients. *Reserving other questions, we conclude that the answer to this one is in the negative"* (emphasis supplied).

In a footnote the court pertinently stated (p 773): "Although we express no opinion as to other professions, the distinctions, historical and functional, between professions, may require consideration of quite different factors. Physicians and lawyers, for example, do not dispense standardized products; they render professional *services* of almost infinite variety and nature, with the consequent enhanced possibility for confusion and deception if they were to undertake certain kinds of advertising."

### III

### Bates v State Bar of Arizona, 433 US 350 (1977)

*Bates* faced the issue left open in *Virginia Parmacy Bd.* and held that the Arizona Supreme Court's disciplinary rule banning advertising by attorneys violated the First Amendment insofar as it applied to the listing of stated fees for legal services in a newspaper advertisement. Mr. Justice BLACK-

MUN, writing for the majority, discussed at some length the United States Supreme Court's holding of the previous year in *Virginia Pharmacy Bd.* and then stated (pp 365-366):

"We have set out this detailed summary of the *Pharmacy* opinion because the conclusion that Arizona's disciplinary rule is violative of the First Amendment might be said to flow *a fortiori* from it. Like the Virginia statutes, the disciplinary rule serves to inhibit the free flow of commercial information and to keep the public in ignorance. Because of the possibility, however, that the differences among professions might bring different constitutional considerations into play, we specifically reserved judgment as to other professions.

"In the instant case we are confronted with the arguments directed explicitly toward the regulation of advertising by licensed attorneys."

The court then analyzed in detail the alleged justifications for banning advertising by lawyers.[2] Mr. Justice BLACKMUN concluded (p 379) that "[i]n sum, we are not persuaded that any of the proffered justifications rise to the level of an acceptable reason for the suppression of *all* advertising by attorneys" (emphasis supplied). He then stated (pp 383-384): "In holding that advertising by attorneys may not be subjected to *blanket* suppression, and that the advertisement at issue is protected, *we, of course, do not hold that advertising by attorneys may not be regulated in any way* * * * As with other varieties of speech, it follows as well that there may be *reasonable restrictions* on the time, place and *manner* of advertising. See *Virginia Pharmacy Board v Virginia Consumer Council*, 425 U.S., at 771 * * * The constitutional issue in this case is *only* whether the State may prevent the publication *in a newspaper* of appellants' truthful advertisement concerning the availability and terms of routine legal services. We rule simply that the flow of such information may not be restrained, and we therefore hold the present application of the disciplinary rule against appellants to be violative of the First Amendment" (emphasis supplied).

---

2. The "justifications" were as follows:
(1) "The Adverse Effect on Professionalism" (pp 368-372);
(2) "The Inherently Misleading Nature of Attorney Advertising" (pp 372-375);
(3) "The Adverse Effect on the Administration of Justice" (pp 375-377);
(4) "The Undesirable Economic Effects of Advertising" (pp 377-378);
(5) "The Adverse Effect of Advertising on the Quality of Service" (pp 378-379); and
(6) "The Difficulties of Enforcement" (p 379).

It is thus clear that the *Bates* court was reaffirming the *Virginia Pharmacy Bd.* caveat that, *inter alia, "the manner* of advertising" could constitutionally be subjected to reasonable restrictions, though a total and generalized ban on advertising could not. Thus, *Bates,* on which respondents rely, does not answer the question of whether mail solicitation directed to a specific person with whom the attorney has had no prior relationship is a *particular* "manner of advertising" *(Bates v State Bar of Arizona, supra,* p 384; *Virginia Pharmacy Bd. v Virginia Consumer Council, supra,* p 771) which may be forbidden by the State as a "reasonable restriction" *(Bates, supra,* p 384) on the form of advertising by licensed professionals which is otherwise generally permitted.

IV

Ohralik v Ohio State Bar Assn., 436 US 447 (1978)

*Ohralik* presented an egregious and classic case of ambulance chasing which originated with blatant *in-person* solicitation by the attorney. The disciplinary board of the Ohio Supreme Court suspended Ohralik for violation of the Disciplinary Rules of the Ohio Code of Professional Responsibility banning solicitation and rejected his claim that his conduct was protected under the First and Fourteenth Amendments.

The scope of the United States Supreme Court's opinion, affirming the Supreme Court of Ohio, went beyond the prohibition of in-person solicitation in the "ambulance chasing" cases and held that the Bar, acting with State authorization, could constitutionally discipline a lawyer for in-person solicitation for pecuniary gain in *all* cases.

The court noted that the decision in *Bates v State Bar of Arizona* (433 US 350, *supra)* was handed down after conclusion of the Ohio proceedings and stated (p 454) that it "noted probable jurisdiction in this case *[Ohralik]* to consider the scope of protection of a form of commercial speech, and an aspect of the State's authority to regulate and discipline members of the bar, not considered in *Bates".*

The *Ohralik* court then stated (pp 454-457):

"The solicitation of business by a lawyer through direct, *in-person* communication with the prospective client has long been viewed as inconsistent with the profession's ideal of the attorney-client relationship and as posing a significant potential for harm to the prospective client. It has been proscribed

by the organized Bar for many years. Last Term the Court ruled [in *Bates*] that the justifications for prohibiting truthful *'restrained'* advertising concerning 'the availability and terms of routine legal services' are insufficient to override society's interest, safeguarded by the First and Fourteenth Amendments, in assuring the free flow of commercial information * * * The balance struck in *Bates* does not predetermine the outcome in this case. The entitlement of in-person solicitation of clients to the protection of the First Amendment differs from *that of the kind of advertising approved in Bates* as does the strength of the State's countervailing interest in prohibition. * * *

"[I]n-person solicitation of professional employment by a lawyer does not stand on a par with truthful advertising about the availability and terms of routine legal services.

"Expression concerning purely commercial transactions has come within the ambit of the Amendment's protection only recently. In rejecting the notion that such speech 'is wholly outside the protection of the First Amendment,' *Virginia Pharmacy, supra,* at 761, we were careful not to hold 'that it is wholly undifferentiable from other forms' of speech. 425 U.S., at 771 n. 24. We have not discarded the 'common-sense' distinction between *speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation,* and other varieties of speech * * * [W]e instead have afforded commercial speech a *limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values, while allowing modes of regulation that might be impermissible in the realm of* noncommercial expression.

"[T]he State does not lose its power to regulate commercial activity deemed harmful to the public whenever speech is a component of that activity. Neither *Virginia Pharmacy* nor *Bates* purported to cast doubt on the permissibility of these kinds of commercial regulation.

"In-person solicitation by a lawyer of remunerative employment is a business transaction in which speech is an essential but subordinate component. While this does not remove the speech from the protection of the First Amendment, as was held in *Bates* and *Virginia Pharmacy,* it lowers the level of appropriate judicial scrutiny". (Emphasis supplied.)

Since *Ohralik* involved *in-person* solicitation the United States Supreme Court specifically discussed its special invidi-

ous aspects, to wit (pp 457-458), that it "may exert pressure and often demands an immediate response," that it "provide[s] a one-sided presentation and * * * encourage[s] speedy and perhaps uninformed decision making" and "is as likely as not to discourage persons needing counsel from engaging in a critical comparison of the 'availability, nature, and prices' of legal services." The court then stated, however (in words which I believe were meant to apply to *more* than in-person solicitation) (p 459): "*A lawyer's procurement of remunerative employment is a subject only marginally affected with First Amendment concerns. It falls within the State's proper sphere of economic and professional regulation * * * While entitled to some constitutional protection, appellant's conduct is subject to regulation in furtherance of important state interests*" (emphasis supplied).

The court continued (pp 460-462):

"In addition to its general interest in protecting consumers and regulating commercial transactions, *the State bears a special responsibility for maintaining standards among members of the licensed professions * * ** 'The *interest of the States in regulating lawyers is especially great since lawyers are essential to the primary governmental function of administering justice, and have historically been "officers of the courts"*' *Goldfarb v Virginia State Bar,* 421 U.S. 773, 792 (1975). * * *

"As is true with respect to advertising * * * it appears that the ban on solicitation by lawyers originated as a rule of professional etiquette rather than as a strictly ethical rule. See H. Drinker, Legal Ethics 210-211 and n. 3 (1953). '[T]he rules are based in part on deeply ingrained feelings of tradition, honor and service. Lawyers have for centuries emphasized that the promotion of justice, rather than the earning of fees, is the goal of the profession.' * * * But the fact that the original motivation behind the ban on solicitation today might be considered an insufficient justification for its perpetuation does not detract from the force of the other interests the ban continues to serve * * * While the Court in *Bates* determined that truthful, restrained advertising of the prices of 'routine' legal services would not have an adverse effect on the professionalism of lawyers, this was only because it found 'the postulated connection between advertising and the erosion of *true professionalism* to be severly strained.' 433 U.S., at 368 (emphasis supplied [by the *Ohralik* court]). *The Bates Court*

*did not question a State's interest in maintaining high standards among licensed professionals. \* \* \**

"[A]ppellant has conceded that the State has a legitimate and indeed 'compelling' interest in preventing *those aspects of solicitation that involve* fraud, undue influence, intimidation, overreaching, and *other forms of* 'vexatious conduct' \* \* \* *We agree that protection of the public from these aspects of solicitation is a legitimate and important state interest.*"

The Supreme Court concluded (p 464) that "the Rules were applied in this case to discipline a lawyer for soliciting employment for pecuniary gain under circumstances likely to result in the adverse consequences the State seeks to avert."

V

## Matter of Primus, 436 US 412 (1978)

Ms. Primus, a practicing lawyer in South Carolina who was also a co-operating lawyer with a local branch of the American Civil Liberties Union (ACLU), was disciplined by the Supreme Court of South Carolina because of her alleged violation of the Disciplinary Rules of that court which, *inter alia,* barred a lawyer from "giv[ing] unsolicited advice to a layman that he should obtain counsel or take legal action" (p 420).

Ms. Primus had advised a gathering of women of their legal rights resulting from their having been sterilized as a condition of receiving further public medical assistance. Among those attending was Mary Etta Williams, who had been sterilized by a physician after the birth of her third child. Ms. Williams attended the meeting because she had been invited by one Gary Allen, a local businessman and officer of an organization which served indigents, and who also was an old family friend. Apparently a month thereafter Mr. Allen told Ms. Primus that Ms. Williams had communicated to him an interest in instituting a lawsuit. At about that time the ACLU informed Ms. Primus that it was willing to provide representation for mothers in the area who had been sterilized. Ms. Primus, by letter, thereupon informed Ms. Williams of the ACLU's offer of free legal representation. Based on the sending of that letter Ms. Primus was charged with solicitation in violation of the Canons of Ethics. Ultimately, the South Carolina Supreme Court held that she had indeed been guilty

of violation of its Disciplinary Rules because of her mail solicitation of Ms. Williams. It then issued a public reprimand.

The United States Supreme Court, in reversing the determination of the South Carolina Supreme Court, held that solicitation of prospective litigants by nonprofit organizations that engage in litigation as a form of political expression or political association constituted expressive and associational conduct entitled to First Amendment protection. It concluded that its 1963 holding in *NAACP v Button* (371 US 415, 428-429, "that the activities of the NAACP, its affiliates and legal staff shown on this record are modes of expression and association protected by the First and Fourteenth Amendments which Virginia may not prohibit, under its power to regulate the legal profession, as improper solicitation of legal business violative of [State law] and the Canons of Professional Ethics") and *Button's* progeny, applied because the case came within the generous zone of protection reserved for associational freedoms, because the proposed litigation was a vehicle for effective political expression and because the letter was a means of communicating useful information in that context. The court further stated (p 426) that *Button's* progeny established the principle that "collective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment" *(United Transp. Union v Michigan Bar,* 401 US 576, 585; see, also, *United Mine Workers v Illinois State Bar Assn.,* 389 US 217, 222).

The holding in *Primus* is not pointedly relevant to this case, since here it is clear that the respondents' mail solicitation offering legal services was solely for their pecuniary benefit. However, the *Primus* opinion, which makes frequent reference to *Ohralik* (which was decided the same day) sheds some light on the right of a State and its Bar to prohibit mail solicitation of prospective clients that is exercised for pecuniary gain. The court stated (p 426): "Without denying *the power of the State to take measures to correct the substantive evils* of undue influence, overreaching, misrepresentation, *invasion of privacy,* conflict of interest, and lay interference that potentially are present in solicitation of prospective clients by lawyers, this Court has required that 'broad rules framed to protect the public and to preserve respect for the administration of justice' must not work a significant impairment of 'the value of

associational freedoms.' *Mine Workers, supra,* at 222" (emphasis supplied).

Thus the court recognized that where there is solicitation for pecuniary gain, "invasion of privacy" is a "substantive evil" against which the State may take appropriate measures.

The court further acknowledged that "invasion of privacy" and "other evils" were invidious consequences of solicitation by lawyers when it stated (p 432): "Appellee [the State of South Carolina] contends that the disciplinary action taken in this case is part of a regulatory program aimed at the prevention of undue influence, overreaching, misrepresentation, *invasion of privacy,* conflict of interest, lay interference, *and other evils* that are thought to inhere generally in solicitation by lawyers of prospective clients * * *. *We do not dispute the importance of these interests."*

Subsequent portions of the court's opinion make it clear that it was only because the case did *not* involve pecuniary gain by the soliciting attorney that the stated "evils [including invasion of privacy] that are thought to inhere generally in solicitation by lawyers of prospective clients" were not relevant. Yet, even in that case of nonpecuniary solicitation, the court took pains to indicate the minimal nature, if not total absence, of invasion of privacy by pointing out that subsequent to the meeting attended by Mary Etta Williams, the appellant was told by Gary Allen, who was a close friend of the Williams family, that Ms. Williams had communicated to him an interest in the lawsuit which had been the subject discussed at the meeting (p 435, n 28). It was based on that fact that the court stated (p 435): "The transmittal of this letter—as contrasted with in-person solicitation—involved no appreciable invasion of privacy".

*Primus* also demonstrates that in a case of solicitation involving pecuniary gain the State has an interest in *preventing overcommercialization* of the legal profession.

"The State's interests in preventing the 'stirring up' of frivolous or vexatious litigation and *minimizing commercialization of the legal profession* offer no further justification for the discipline administered in this case. The *Button* Court declined to accept the proffered analogy to the common-law offenses of maintenance, champerty, and barratry, *where the record would not support a finding that the litigant was solicited* for a malicious purpose or *'for private gain, serving no public interest,'* 371 U. S., at 440; see *id.,* at 439-444. The

same result follows from the facts of this case. And *considerations of undue commercialization of the legal profession are of marginal force where, as here, a nonprofit organization offers its services free of charge to individuals who may be in need of legal assistance and may lack the financial means and sophistication necessary to tap alternative sources of such aid"* (pp 436-437; emphasis supplied).

Further, the Supreme Court, citing *Bates* and *Virginia Pharmacy Bd.,* stated (p 438) that "[t]he State is free to fashion reasonable restrictions with respect to the time, place and manner of *solicitation* by members of its Bar" (emphasis supplied). Finally, the court said (pp 438-439): "The State's special interest in regulating members of a profession it licenses, and who serve as officers of its courts, amply justifies the application of narrowly drawn rules to proscribe solicitation that in fact is misleading, *overbearing,* or involves other features of deception or improper influence. As we decide today in *Ohralik,* a State also may forbid in-person solicitation for pecuniary gain under circumstances likely to result in these evils * * *. *Accordingly, nothing in this opinion should be read to foreclose carefully tailored regulation that does not abridge unnecessarily the associational freedom of nonprofit organizations, or their members, having characteristics* like those of the NAACP or the ACLU" (emphasis supplied).

## VI

### Summary of the Pertinent Cases

A summary of the cases discussed in Parts I to V demonstrates the following:

█ 1. Although commercial speech is no longer deemed to be wholly outside the protection of the First Amendment *(Virginia Pharmacy Bd. v Virginia Consumer Council,* 425 US 748, 765, *supra),* it is distinguishable from other forms of speech *(Ohralik v Ohio State Bar Assn.,* 436 US 447, 455, *supra)* and holds a "subordinate position in the scale of First Amendment values" *(Ohralik, supra,* p 456).

2. Particularly, there is a " 'common-sense' distinction between speech proposing a commercial transaction, *which occurs in an area traditionally subject to government regulation,* and other varieties of speech" *(Ohralik, supra,* pp 455-456; emphasis supplied). The State has a "special interest in regulating members of a profession it licenses, and who serve as

officers of its courts" *(Matter of Primus,* 436 US 412, 438, *supra).*

3. Therefore "modes of regulation that might be impermissible in the realm of noncommercial expression" may be applied to forms of commercial speech *(Ohralik, supra,* p 456).

4. Although "[s]ome forms of commercial speech regulation are surely permissible" *(Virginia Pharmacy Bd., supra,* p 770), the State may not completely prevent the dissemination, by commercial speech, of the price of professional services *(id.,* p 771).

■ 5. The State may promulgate "a reasonable regulation of the manner in which commercial advertising could be distributed" *(Bigelow v Virginia,* 421 US 809, 819, *supra)* and, in particular, may restrict advertising "that is related to activities the State may legitimately regulate" (p 825).

"In addition to its general interest in protecting consumers and regulating commercial transactions, the State bears a special responsibility for maintaining standards among members of the licensed professions" *(Ohralik, supra,* p 460). "The *Bates* Court did not question a State's interest in maintaining high standards among licensed professionals" *(Ohralik, supra,* p 461).

■ 6. None of the alleged justifications for a ban on advertising by attorneys rise to the level of an acceptable reason for the suppression of *all* advertising by attorneys (see *Bates v State Bar of Arizona,* 433 US 350, 379, *supra);* advertising by attorneys may not be subjected to *blanket* suppression *(Bates, supra,* p 383) because the State's interest in maintaining high standards for the professions licensed by it may not be enforced "by keeping the public in ignorance of the entirely lawful terms that competing pharmacists are offering" *(Virginia Pharmacy Bd. v Virginia Consumer Council,* 425 US 748, 770, *supra).*

7. Specifically, the State may not prevent the publication *in a newspaper* of an attorney's truthful advertisement concerning the availability and terms of routine legal services *(Bates, supra,* p 384).

8. Nevertheless, the State may restrict the *manner* of advertising professional services provided that "restrictions of that kind * * * are justified without reference to the content of the regulated speech, that they serve a significant governmental interest, and that *in so doing they leave open ample alterna-*

*tive channels for communication of the information" (Virginia Pharmacy Bd., supra,* p 771; emphasis supplied).

■ 9. Solicitation by a lawyer of remunerative employment is a business transaction in which speech is an essential but subordinate component *(Ohralik, supra,* p 457)[3] so that the banning thereof is subjected to a lower level of an appropriate judicial scrutiny than would be the case if it did not involve a business transaction *(id.).*

10. The protection of the public from aspects of soliciation which involve, *inter alia, "vexatious conduct",* is "a legitimate and important state interest" *(Ohralik, supra,* p 462).

11. The State has the right to take measures to regulate substantive evils, including *invasion of privacy,* that potentially are present in solicitation of prospective clients by lawyers *(Matter of Primus,* 436 US 412, 426, *supra). Invasion* of privacy is one of the evils "that are thought to inhere generally in solicitation by lawyers of prospective clients" *(Primus, supra,* p 432), and the United States Supreme Court does "not dispute the importance" of regulations aimed at the prevention of such evils *(Primus, supra,* p 432).

12. The State has an interest in *"minimizing commercialization* of the legal profession" and considerations "of undue commercialization of the legal profession" are more than of marginal force where the solicitation is for pecuniary gain *(Primus, supra,* pp 436-437; emphasis supplied).

13. "The State is free to fashion *reasonable restrictions with respect to the * * * manner of solicitation* by members of its Bar" *(Primus, supra,* p 438; emphasis supplied).

14. The State may apply "narrowly drawn rules to proscribe solicitation that in fact is * * * overbearing" *(Primus, supra,* p 438).

15. If there is an unstrained connection between the particular *manner* of advertising of the prices of legal services and "the erosion of *true professionalism" (Ohralik, supra,* p 461),

---

3. Although, at the cited page, the court was referring to the specific form of solicitation presented in the case, to wit, *in-person* solicitation, it is clear that solicitation by *letter* is at least equally "a business transaction in which speech is an essential but subordinate component" *(Ohralik,* at p 457). This is manifest in the *Ohralik* court's statement (at p 459) that "[a] lawyer's procurement of remunerative employment is a subject only marginally affected with First Amendment concerns. It falls within the State's proper sphere of economic and professional regulation." The court thus did not limit the lower level of First Amendment protection speech involving "procurement of remunerative employment" to *in-person* solicitation.

the State may properly ban such manner of advertising (provided there are ample alternative manners of advertising [*Virginia Pharmacy Bd., supra,* p 771]), since "[t]he *Bates* Court did not question a State's interest in maintaining high standards among licensed professionals" *(Ohralik, supra,* p 461).

### CONCLUSION

■ The letters here in issue are clear examples of commercial speech, motivated by pecuniary interest and serving no purpose other than ultimately to secure a business transaction. As commercial speech, the letters are subject to regulation pursuant to the above-enunciated principles. Moreover, the instant letters may not be classified as a form of advertising. As exemplified by the *Bates* case *(supra),* and as implicitly envisioned by the rules of our court (22 NYCRR 691.22), permitted advertising entails a public notice of the availability of legal services at a specified rate for purposes of informing the public and thereby assisting the public in making an informed choice of legal counsel (see, also, Ballentine's Law Dictionary [3rd ed], p 41, which defines "advertise" as: "To make known to the public through a medium of publicity that one's goods or services are available for sale or engagement"). Soliciting, by contrast, connotes an act of entreaty to obtain a particular business transaction. The general dichotomy between advertising and soliciting was discussed in *State v Cusick* (248 Iowa 1168, 1172) as follows: "We have determined there is a distinction between 'soliciting' sales and advertising or an advertisement. The Arkansas Supreme Court commented upon this distinction in Carter v State, 81 Ark. 37, 38, 98 S.W. 704. 'Advertise' is therein defined as: ' "The act or practice of bringing anything, as one's wants or one's business, into public notice, as by paid announcement in periodicals, or by hand bills, placards, etc., as to secure customers by advertising" "To solicit" is thus defined: "To importune, entreat, implore, ask, attempt, try to obtain" '. It further stated: '* * * None of the uses of this term embrace advertising, although advertising is a method, in a broad sense, of soliciting the public to purchase the wares advertised. But soliciting is a well-known and defined action, and advertising is an equally well-known and defined action, and they are not identical. It is true that they are intended to reach the same result, the sale

of the wares, but different routes are traveled in reaching that end; one is legislated against, and the other is not.'"

From the above perspective, it is plain that the subject letters, addressed to a captive audience, constitute solicitation which may be properly proscribed. The letters are significantly different from a mere advertisement which advises the public of the availability of legal services. Instead, the letters seek out particular individuals believed to be interested in a particular transaction and urge that such persons retain the respondents to represent them.

The letter to the brokers, too, seeks to establish a relationship of systematic solicitation, wholly independent of any pre-existing personal relationship. Such conduct has long been considered as solicitation (cf. *People v Schneider*, 20 AD2d 408). The attendant evils of such a relationship are highlighted by the implication that the broker will somehow benefit by the establishment of such a relationship of referrals. The prospect of a benefit necessarily suggests the possibility of a conflict of interest to the detriment of the seller of the real property (see n 5).

The letter to the homeowners endeavors to establish a personal and private relationship which is peculiarly geared to a particular legal transaction. This letter, which is insulated from the commercial marketplace of competitive advertising, goes far beyond the allowable type of restrained advertising aimed at giving public notice of the availability of legal services which was approved of in *Bates v State Bar of Arizona* (433 US 350, *supra*).

Nor may it be doubted that solicitation by mail may be proscribed. Section 479 of the Judiciary Law and the related Disciplinary Rules are prophylactic in nature. Regardless of the particular abuse in the present case, the potential for abuse and the detrimental effects resulting from the use of commercial speech characterized by the subject letters are contrary to the important governmental interest in prohibiting certain forms of solicitation.[4] The regulation of solicitation

---

4. *Bates v State Bar of Arizona* (433 US 350, *supra*), decided a bare two years ago, has resulted in an explosion of newspaper advertising by attorneys. A survey conducted for the *American Bar Association Journal* revealed that within one year 3% of attorneys had so advertised, going up to 7% by the end of the second year (see NYLJ, Aug. 21, 1979, p 1, col 5). We may well assume that in this "yeasty" field the percentage will rise in succeeding years because of the increasing acceptance of advertising *by attorneys* as an appropriate competitive tool for obtaining legal

(n. contd.)

business. Thus, it cannot be reasonably denied that there is now an "ample channel of communication", alternative to the mail solicitation here indulged in, for letting the public know what an attorney will charge.

A lawyer's letter commands immediate attention, if not fear. "Junk-mail" from others will often not even meet the respect of being opened; that will hardly ever happen to an envelope bearing indicia that it is from an attorney. It willy-nilly forces itself upon the attention of the recipient whose heart may momentarily flutter (knowing that the lawyer is not his own) until he finds out that nobody is making a legal claim against him. It is as much an intrusion into the privacy of the recipient's home and into his right to be left alone, as would be a taped telephone call from a previously unknown attorney advising of his availability to perform stated legal services for stated prices, or an enforced personal solicitation by an attorney at his doorstep.

Can there be any doubt that if mail solicitation is permitted mailing lists will be purchased by some attorneys in order to minimize the percentage of nonresponses? Anonymity will be lost and the right to be left alone will be vexatiously despoiled. People seeking advice from marriage counselors will receive letters from the matrimonial bar. The spread of rumors of marital discord will lead to the receipt of letters from lawyers seeking to be the first to advise of their reasonable fees for separation and divorce. Patients, released from the traumatic injury wards of hospitals (or even while they are still hospital patients), will be barraged by letters from negligence attorneys, if not from the medical malpractice bar. As judgments are entered, the bankruptcy attorneys will be heard from. Arrests may result in letters from the criminal Bar. The obituary pages will result in a flood of mail to the mourning next of kin while yet the funeral baked meats remain unconsumed. Victims of airplane disasters, railroad accidents, bus collisions and even simple motor vehicle accidents will be subjected to huckstering solicitations, including reproduced copies of judgments and checks in six- and seven-figures. As a part of mail solicitation the "Bigs" of torts will be free to present reproduced copies of newspaper articles listing them as high-rank tort litigators "not only in their six- and seven-figure settlements and verdicts but in advancing novel theories for recovery" (see NYLJ, March 12, 1979, p 1, cols 2, 3).

That this is not a chimera nor a parade of imaginary horribles is shown by what occurred after the May 25, 1979 crash of the American Airlines DC-10 in Chicago. Here is how Lee S. Kreindler, Esq., who authors a column entitled "Aviation Law" in the New York Law Journal, described it in an article entitled "Chicago Post-Mortem-Shameful Behavior" (NYLJ, June 15, 1979, p 1, col 1, p 5, col 1):

"This accident, like most major crashes, has been followed by overt solicitation of cases by irresponsible lawyers * * * When an accident like the one in Chicago occurs there is enormous public interest. The names of victims and the cities in which they live are published in the newspapers almost immediately. The families are accessible and it is unfortunate that they become targets of irresponsible lawyers. * * *

"I have been told that families received unsolicited calls. A lawyer, or more frequently someone from his office, called to say, 'my office will be handling cases in this accident and we would like to offer you our services.' * * * Sometimes the call asserted a particular reason for retaining a lawyer. 'You should file suit in Chicago, because Illinois law will not consider the income taxes that the deceased paid.' Unfortunately, some of those who called are well-known in the field."

If we were to hold that only direct *in-person* solicitation is invalid we would be giving the imprimatur of legality to such shocking tactics. Even were we, in an appropriate case, to hold that *telephone* solicitation is essentially *in-person* solicitation (while mail solicitation is proper) we would still be legalizing blatant invasion of

involves the consideration of: (1) whether there are "ample alternative channels for communication of the information" *(Virginia Pharmacy Bd., supra,* p 771); (2) whether the solicitation involves vexatious conduct or invasion of privacy *(Ohralik v Ohio State Bar Assn.,* 436 US 447, 462, *supra; Matter of Primus,* 436 US 412, 426, *supra);* and (3) whether the solicitation unduly commercializes the legal profession or unduly erodes true professionalism contrary to the "State's interest in maintaining high standards among licensed professionals" *(Ohralik, supra,* p 461).

Law is a profession. Thus, in this realm of the law commercial speech has its boundaries and limits as well as its horizons. As a member of a most honorable profession, a member of the Bar must never forget that he is a lawyer first and only then, if proper, an entrepreneur.

We therefore hold that section 479 of the Judiciary Law and DR 2-103 (A) of the Code of Professional Responsibility are constitutional insofar as they ban solicitation of legal business by mail as well as in person and that they were here violated by the respondents. We do not, however, reach the question of whether all mailing is proscribed.

In accordance with the views here expressed, the motion of the petitioner to confirm the report of the Referee is therefore granted. However, since the letters were apparently sent in good faith, though in mistaken reliance on the *Bates* decision, the respondents should neither be disbarred, suspended nor censured.[5]

---

privacy of persons who should be given the decent respect of being left alone. Such intrusion into the most delicate feelings of suffering people would not be any less merely because the statements contained in the written solicitations. truthfully showed that the lawyer recovered a million dollars in a similar case, or informed the recipient of the fee for handling the estate.

The legalization of the tactics just referred to would constitute an undue and shameful commercialization of a most noble profession. Such tactics cannot help but induce contempt by the laity for the profession of law as a whole. For the court to encourage the infliction of such wounds upon licensed professionals, and such ills upon the laity, would make it an accessory to malevolent deeds. We do not choose to be such an accessory.

5. We thus exonerate the respondents although we are perturbed by their questionable tactics in: (1) indicating to the brokers that only the persons they recommend would obtain the benefit of the reduction of the fee from the advertised $235 to $195, while the letter to the homeowners gave the impression that because they were solicited by mail, *they* were the only ones who will be obtaining the reduction to $195; and (2) writing to the homeowners stating that "We understand that you are selling your home", although the fact that approximately 7,500 of such letters were mailed, would apparently indicate that they had no such understanding at all.

The members of the Bar having been put on notice by this opinion of the strictures here laid down, any future violation will necessitate the taking of appropriate disciplinary measures.

MOLLEN, P. J., HOPKINS, RABIN and GULOTTA, JJ., concur.

---

We also discern an evil in the solicitation of real estate brokers to refer their clients in real estate transactions to the respondents. There are clearly elements of potential conflict of interest since the real estate broker would instinctively hope and expect that the attorney, in return for the reference, and in hope of future references, would protect the interest of the real estate broker in the transaction, even though the interest of the real estate broker might be adverse to the interest of the attorney's client (e.g., the reduction of the broker's commission). If the "broker-referred client" were the proposed purchaser and it developed that marketability of title was equivocal, the conflict would be between the broker's desire for consummation of the closing (so that he could obtain the commission) and the danger that the purchaser might have difficulty in reselling. It seems unnecessary to point out other readily apparent possible conflicts of interest. The letter of the respondents in this case to the brokers shows the real danger of a divided loyalty when it says "We look forward *to assisting you* by assisting your clients." Carrying water on both shoulders is not an easy task.