OPINION OF THE COURT
Meyer, J.
To the extent that section 479 of the Judiciary Law and DR2-103 (A) of the Code of Professional Responsibility *121 proscribe advertising of attorneys’ services by direct mail addressed to real estate brokers, those provisions regulate the manner rather than the content of commercial speech and, the regulations being reasonable and the State having a substantial interest in the protection of clients against potential conflict of interest, are constitutional regulations of such speech. Thus, we answer so much of the question left open in Matter of Koffler (51 NY2d 140, 145, cert den 450 US 1026) concerning third-person mailings as relates to mailings addressed to real estate brokers by holding regulations proscribing such mailings constitutional. The order of the Appellate Division should, therefore, be affirmed, without costs.
Respondent Greene was admitted to the practice of law in New York in 1960. He admitted in his answer to the disciplinary proceeding brought against him by the Grievance Committee for the Ninth Judicial District that “in or about August, 1978 and October, 1978, Respondent caused to be prepared and caused to be mailed approximately one thousand direct mail fliers to real estate brokers in Westchester County and portions of Putnam County” and concedes in his brief before us that he was “hoping by his mailings to move the recipients to remember his availability should the occasion arise when a buyer or seller sought a reference to an attorney in a real estate transaction.” The flier read in pertinent part:
“ALAN I. GREENE offers your client full legal representation on any and all property transactions for just $335. Legal coverage begins with contract and continues through to closing. With 18 years experience, the office of ALAN I. GREENE is fully prepared to expedite all closings and offer competent advice to the buyer and/or seller. Your real estate office will be afforded our full cooperation. With just two hours notice, a contract and all legal documents can be prepared.
“By recommending the services of ALAN I. GREENE, you, the realtor, will save your client time and money — one of the main reasons they called on you!”
Testifying before the Referee, respondent stated that he got *122 no business from the brokers to whom the flier was sent, indeed, that he had gotten a negative response from them.
The Referee, treating the issue as one of law to be decided on the basis of the undisputed facts, found respondent in violation of section 479 of the Judiciary Law and DR 2-103 (A) of the Code of Professional Responsibility, but noted in his report that the fliers had been sent prior to the Appellate Division’s decision in Matter of Koffler (70 AD2d 252) and were mailed in reliance on Bates v State Bar of Ariz. (433 US 350), and that in Koffier the Appellate Division had imposed no sanction.
Petitioner moved for confirmation of the Referee’s report and the disciplining of respondent. Respondent likewise moved “for an order confirming and adopting the report” but asked that he, as had been the attorneys in Koffler, be exonerated. The Appellate Division, noting our reversal in Koffier and reservation of the third-party mailing question, found that the fliers “directly solicited the real estate brokers to refer individuals to the respondent to use the respondent’s legal services in connection with the sale or purchase of real property” as alleged in the petition, and held such a mailing proscribed and not constitutionally protected, but imposed no sanction. The appeal is before us on constitutional grounds (CPLR 5601, subd [b], par 1).
As we noted in Koffler (51 NY2d, at p 143, n 1), the absence of sanction does not affect respondent’s right of appeal from the confirmed finding of a violation. Petitioner argues, however, that the appeal should be dismissed as moot because respondent was on April 9, 1981 suspended from the practice of law, on the basis of Incapacity, and for lack of aggrievement in view of respondent’s motion to confirm. Respondent suggests that the record is not appropriate for decision, that the State interest sought to be protected is not sufficiently defined, and that his mailing is not in-person solicitation such as was condemned by the Supreme Court in Ohralik v Ohio State Bar Assn. (436 US 447). In an amici brief filed on behalf of four attorneys against whom similar charges are pending in the Third Department, it is argued that what is regulated in this instance is not manner of distribution but content. We affirm, though *123 upon somewhat different reasoning than that of the Appellate Division.
I
The arguments for dismissal require little comment. For the same reason that the absence of sanction does not foreclose appeal from the finding of violation, it cannot be said that respondent was not aggrieved by the Appellate Division’s order. Though his motion paper could have been more carefully worded, it clearly asked for “exoneration”, which is inconsistent with the legal conclusion suggested by the Referee. The reference was to hear and report and the facts being undisputed, we construe the motion paper to have requested confirmation of the factual conclusions of the Referee, but not of his conclusion of law.
Nor does respondent’s suspension for incapacity after the Appellate Division decision moot the question, for that suspension, though indefinite in time, was made because of respondent’s inability to participate in a formal disciplinary hearing. Though no sanction has been imposed in the instant proceeding, the finding of violation is a professional stigma that may be considered in determining the discipline to be imposed after formal hearing on the new charges should respondent recover from his incapacity and the result of such a hearing be against him. Even if that were not so, the pendency of four other similar proceedings against amici suggests that the controversy is of a recurring character and should be considered by us rather than dismissed for mootness.
II
The proscriptions, the constitutionality of which is in issue, are found in section 479 of the Judiciary Law and DR2-103(A) of the Code of Professional Responsibility. The former reads: “It shall be unlawful for any person or his.agent, employee or any person acting on his behalf, to solicit or procure through solicitation either directly or indirectly legal business, or to solicit or procure through solicitation a retainer, written or oral, or any agreement authorizing an attorney to perform or render legal services, *124 or to make it a business so to solicit or procure such business, retainers or agreements”. The latter, as amended on April 29, 1978, provides: “A lawyer shall not solicit employment as a private practitioner of himself or herself, a partner or an associate to [sic][1] a person who has not sought advice regarding employment of a lawyer in violation of any statute or court rule. Actions permitted by DR 2-104 and advertising in accordance with DR 2-101 shall not be deemed solicitation in violation of this provision.”[2] DR 2-104 (C) permits a lawyer to “accept employment which results from participation in activities designed to educate the public to recognize legal problems, to make intelligent selection of counsel or to utilize, available legal services”, but the section is not otherwise germane.
The effect of our Koffler decision and of the Supreme Court decisions referred to in that opinion and in this is to leave the rule declared by the Legislature in section 479 of the Judiciary Law, free to operate in areas not affecting constitutionally free speech (Belli v State Bar of Cal., 10 Cal 3d 824, application for stay den 416 US 965). Though amendment of the section might clarify the intention of the Legislature as a source, co-ordinately with the judiciary, of the public policy governing the conduct of lawyers, the absence of such amendment leaves no vacuum. The section remains effective except as constitutionally proscribed.
The Code of Professional Responsibility is, however, an enactment of the New York State Bar Association rather than the Legislature or any court. Its provisions have been incorporated by reference in the rule defining professional misconduct (22 NYCRR 603.2, 691.2, 806.2, 1022.17) adopted by each of the Appellate Divisions pursuant to statute (former section 216 of the Judiciary Law) and con- *125 tinned in effect by section 13 of chapter 156 of the Laws of 1978. The specific provisions of the code dealing with advertising have also been adopted as a rule by each of the Appellate Divisions, with the minor change referred to in footnote 2 above (22 NYCRR 603.22, 691.22, 806.15, 1022.16). But the code cannot, either directly or through incorporation in a court rule, amend or limit a statute adopted by the Legislature (People v La Carrubba, 46 NY2d 658, 663; see Matter of Weinstock, 40 NY2d 1, 6). Thus, even if DR 2-104 were broad enough in language to be deemed to authorize third-party direct mail generally (which, in our view, it is not), it would not limit the effect of section 479 of the Judiciary Law, as a bar to such advertising. In light of that fact and of the limiting phrase (“in violation of any statute or court rule”) in the first sentence of DR 2-103 (A), the questions before us are, therefore, reduced to whether as a matter of statutory construction section 479 of the Judiciary Law, proscribes third-party mailings and, if so, whether such a proscription is constitutionally permissible.
The statutory construction question is answered, in essence, by our holding in Koffler (51 NY2d, at p 146) that “'[n]ot all solicitation is advertising, though all advertising either implicitly or explicitly involves solicitation” and by the words “directly or indirectly” contained in section 479. Direct mail advertising addressed to real estate brokers is, as respondent conceded and the Appellate Division found, direct solicitation of the brokers to refer clients to respondent, and, thus, indirect solicitation of clients by respondent.
Ill
Because overbreadth analysis does not apply to commercial speech (People v Mobil Oil Corp., 48 NY2d 192, 199) and because laws regulating the time, place or manner of speech stand on a different footing from laws restricting speech because of its subject matter or content (Linmark Assoc, v Willingboro, 431 US 85, 93; Police Dept. of Chicago v Mosley, 408 US 92, 95), we turn first to consideration of respondent's flier.
Our conclusion is that it is the manner rather than the content of the speech in issue which brings it into conflict *126 with the statute. While its last paragraph specifically asks that respondent be recommended to clients of the brokers receiving the flier, the necessary implication of the transmittal to the brokers of the information contained in the first quoted paragraph is that respondent seeks by sending the flier to the broker to have clients of the broker referred to him for legal work. This is conceded by respondent’s brief and would, in any event, necessarily follow from the fact that a real estate broker is one “who, for another and for a fee * * * sells * * * exchanges, buys or rents * * * an estate or interest in real estate” (Real Property Law, § 440; see Executive Law, § 292, subd 14). In short, were the fourth sentence of the first quoted paragraph and the last paragraph of the flier omitted, the statute would proscribe it nevertheless. It is, thus, the manner of advertising the service to respondent’s potential clients rather than the fact that the flier explicitly asks for recommendations that runs it afoul of the statute (see Eaton v Supreme Ct. of Ark. Committee on Professional Conduct, 607 SW2d 55 [Ark], cert den 450 US 966).
Nor can it be said, as was held in Linmark (supra) that though as applied to respondent it restricts but one method of communication, the restriction is nonetheless related to content. Linmark’s conclusion was based upon the ineffectiveness of alternatives to a “For Sale” sign, the absence of a prohibition of lawn signs bearing other messages, and the lack of a detrimental secondary effect on society. Here, respondent concedes that his letter to brokers, like the newspaper advertisement in Koffler, was ineffective,[3] whereas direct mail to clients, permitted under Koffler and shown in that case to be productive, is the more fruitful option. Here, also, though under familiar principles of jurisprudence we limit our ruling to third-party mailings to brokers, the statutory language prohibits all third-party mailings, not just mailings to brokers. Finally, there is, as hereafter demonstrated, a detriment to society in the potential conflict of interest that may be generated when those in need of legal services are approached indirectly through a broker. The restriction imposed upon respondent neither is, nor should it be construed to be, one upon content. And as a *127 regulation of the manner of speech, control of which in light of the governmental interest to be served, the lack of effectiveness of the medium and the more effective available alternatives, must be deemed reasonable, the statute as applied to respondent is constitutional (Matter of Koffler, supra, at p 150; Consolidated Edison v Public Serv. Comm., 447 US 530, 535-536; Virginia Pharmacy Bd. v Virginia Consumer Council, 425 US 748, 771).
But if we were to construe the statute as addressed to content, our conclusion would be no different. As we noted in Koffler (51 NY2d, at p 147), Central Hudson Gas v Public Serv. Comm. (447 US 557, 566) establishes- four criteria: (1) Is the speech misleading or related to unlawful activity? (2) Is the governmental interest sought to be protected substantial? (3) How directly does the regulation advance that interest? (4) Is there a less restrictive alternative?
The Grievance Committee makes no contention that the flier is misleading. And though section 479 has its genesis in section 270-a of the Penal Law of 1909, it is not speech as activity but the activity to which the speech relates (here, legal services in relation to the purchase or sale of a house) with which this portion of the criteria is concerned. Neither deception nor unlawfulness can sustain application of the statute to respondent’s flier, therefore.
There is, however, a substantial governmental interest in preventing conflicts of interest in attorney-client relationships which the statute directly protects and for which there is no adequately protective less restrictive alternative. The Supreme Court has many times recognized as a proper and substantial governmental interest the prevention of conflicts of interest (Matter of Primus, 436 US 412, 436 [“serious likelihood of conflict of interest”] ; Ohralik v Ohio State Bar Assn., 436 US 447, 461, n 19, supra [“we cannot say that the pecuniary motivation of the lawyer who solicits a particular representation does not create special problems of conflict of interest”], and see id., at p 464, n 22; NAACP v Button, 371 US 415, 443 [“serious danger * * * of professionally reprehensible conflicts of interest which rules against solicitation frequently seek to *128 prevent”]; see, also, Mine Workers v Illinois Bar Assn., 389 US 217,223-224). Though the potential for conflict played a part in sustaining the speech limitation only in Ohralik, the reason it was held insufficiently present in the other cases was the absence of monetary stakes for the union or other community group, whose collective activity was undertaken to assure meaningful access to the courts.
Not only is there an absence of associational activity in the instant case, but also there are present the pecuniary interests of both the attorney and the broker. Moreover, since the broker is in direct contact with his prospect (the lawyer’s potential client), there is present also the in-person solicitation element which Ohralik found sufficient to sustain regulation against constitutional attack. Of importance in Ohralik's determination were the lack of sophistication of the usual client, the pecuniary interest of the solicitor, the difficulty or impossibility of obtaining reliable proof of what occurred in such an encounter (436 US, at pp 464-466). Those factors made permissible “prophylactic measures whose objective is the prevention of harm before it occurs” (id., at p 464). The same presumed lack of sophistication, pecuniary interest and difficulty of proof are present here. Moreover, in-person solicitation discourages the comparison shopping which is the very heart of the concept behind dissemination of information concerning legal services: to assure “informed and reliable decisionmaking” (Bates v State Bar of Ariz., 433 US 350, 364, supra; see Reich, Preventing Deception In Commercial Speech, 54 NYU L REV 775, 801, 804; Worsham, Solicitation By Attorneys: A Prediction And A Recommendation, 16 Houston L Rev 452, 468-471).
Nor, as Ohralik makes clear (and Primus confirms [436 US, at p 434]), is it required that there be “actual proved harm to the * * * individual” (436 US, at p 464). “[T]he absence of explicit proof or findings of harm or injury is immaterial” (id., at p 468); “the potential for overreaching * * * inherent in * * * in-person solicitation” (id.) is enough to justify such a regulation (see Note, Attorney Solicitation Clients, 7 Hofstra L Rev 755, 773-774).
Measuring against that background, we conclude that *129 even as content regulation section 479 should be held constitutional.[4] The possibility that the lawyer’s view of marketability of title may be colored by his knowledge that the referring broker normally will receive no commission unless title closes, the improbability that the attorney will negotiate to the lowest possible level the commission to be paid to the broker who is an important source of business for him (or suggest to the client that he do so), the probability that the lawyer will not examine with the same independence that he otherwise would the puffery that the broker has indulged in to bring about the sale are examples of the conflict potential to be protected against. Nor can we agree with the Supreme Court of Kentucky (Kentucky Bar Assn. v Stuart, 568 SW2d 933 [Ky]) that the filing with the overseeing agency of a lawyer’s solicitation letter to brokers, adequate though it may be to protect against any evils of direct mail addressed to clients (Matter of Koffler, 51 NY2d 140, 150, supra), is adequate protection against the conflict of interest problems involved in attorney mailings to brokers. It is one thing for a disciplinary system to police the language in client direct mail advertising and quite another to expect that anything approaching proper oversight can be accomplished simply by the filing of a copy of a broker letter when the client relationship results not from the letter but from the intermediation of the broker.
For the foregoing reasons, the order of the Appellate Division should be affirmed, without costs.

. As originally adopted by the New York State Bar Association, DR2103(A) used the word “recommend” rather than “solicit” in its first line. Moreover, it did not include the present second sentence or the last eight words of the first sentence.

. The petition refers also to the Rules of the Appellate Division without specific reference to any rule. Rule 691.22 (22 NYCRR 691.22) deals with “Advertising and publicity by attorneys”, but is not considered further because not referred to by either court below and not otherwise germane to the discussion which follows. DR2-101, referred to in DR2-103(A), is, except for the substitution of “lawyer” for “attorney”, identical with rule 691.22.

. The brief of amici states that their experience was the same.

. Accord Allison v Louisiana State Bar Assn. (362 So 2d 489 [La] [solicitation through employer of employee participants in a prepaid legal services plan]) ; contra State Bar Grievance Administrator v Jaques (407 Mich 26 [solicitation of tort claims through union agent] ) ; Kentucky Bar Assn. v Stuart (568 SW2d 933 [Ky] [attorney’s letter to real estate broker]; and see Figa, Lawyer Solicitation Today And Under The Proposed Model Rules of Professional Conduct, 52 Col L Rev 393, 404). It is questionable whether Jaques would be applied to a situation such as the present (see Wall v Attorney-General, 409 Mich 500, 550). Both Jaques and Stuart may be distinguished on the ground that neither discussed potential conflict of interest, but to the extent that they cannot be so distinguished we decline to follow them.