551 So.2d 129 (1989)
MISSISSIPPI STATE BAR
v.
AN ATTORNEY: L.
No. CM-223.
Supreme Court of Mississippi.
June 28, 1989.
As Modified on Denial of Rehearing October 18, 1989.
Michael B. Martz, Jackson, for appellant.
Stella L. Terrell, Yazoo City, for appellee.
En Banc.
BLASS, Justice.
On January 31, 1986, a formal complaint was filed against the respondent by the Mississippi State Bar. The Bar alleged that respondent had violated the provisions of DR 1-102(a)(1, 4, 5, and 6) of the Code of Professional Responsibility, which provide that a lawyer shall not violate a disciplinary rule, engage in conduct involving dishonesty, fraud, deceit, or misrepresentation; engage in conduct that is prejudicial to the administration of justice; or engage in other conduct that reflects adversely on his fitness to practice law. The formal complaint also alleged that the respondent violated the provisions of DR 7-101(a)(3) which provides that a lawyer shall not intentionally prejudice or damage his client during the course of the professional relationship. The complaint also alleged violation of § 73-3-35, M.C.A. (1985 Supp.), the lawyer's oath.
A hearing was held in October of 1987. At the close of the Bar's case in chief, the tribunal sustained respondent's motion for directed verdict on the issue of the client's capacity to contract on April 6, 1985, when she signed a contingency fee contract with the respondent. After the respondent presented his defense, the tribunal by a *130 two-to-one vote, dismissed the complaint, finding the Bar Association had failed by clear and convincing evidence to prove the allegations contained in the complaint. From this dismissal, the Bar appeals.
Finding that the Bar has failed to prove by clear and convincing evidence the facts necessary to support a judgment that the respondent has been guilty of misconduct as defined in the Complaint, the disciplinary rules and the statute mentioned above, we affirm the dismissal of the complaint. We do so with reluctance, because we are of the opinion that the story unfolded below is a sorry one and one which reflects no credit upon any of those involved.

FACTS
In the interest of anonymity, the names of the players in this drama have been changed. The major parties are: respondent, (A), a member of the Bar in Louisiana and Mississippi, with an office in Monroe, Louisiana; EWE, complainant, originally (A)'s client, who filed the complaint with the Bar through her new attorneys; (B) and (C), attorneys for EWE with offices in Jackson, Mississippi, who filed the complaints against (A) in both Louisiana and Mississippi; Joe, EWE's brother, who assisted her in her business affairs; and Rhonda, a friend of Joe's, and whose sister was (A)'s client in another case.
On March 31, EWE was injured in a railroad crossing accident in Newton, Mississippi, while riding as a guest passenger in an automobile driven by her friend, Ruby. EWE was hospitalized in Meridian, Mississippi. On or about April 3, 1985, Rhonda telephoned her sister's lawyer (A) and told him that she knew of a lady who had been hurt in an accident and needed the services of a lawyer. (A) drove from Monroe to Newton, Mississippi, on Friday, April 5 and met Rhonda. Rhonda and (A) went to Meridian to see EWE. At this time, (A) had not had any contact with any member of EWE's family. Upon arriving at EWE's hospital room in Meridian, (A) was introduced to EWE, who was lying in the bed. Several of her relatives, including one of her brothers, Roy, was in the room. After the introductions were completed, (A) discussed his possible representation of EWE with her and her brother Roy. Both EWE and Roy referred (A) to one of EWE's other brothers, Joe, who was responsible for her business affairs. No contract of employment was signed during the initial hospital visit.
(A) and Rhonda left the hospital and returned to Newton to locate Joe. They found him fishing at a lake near Lawrence, Mississippi. They discussed EWE's case with Joe and another brother, Doug.
Later that night (A) and Joe travelled together to Meridian to see EWE. On the trip they discussed the details of the representation. After arriving at the hospital in Meridian (A), Joe, and Doug went to EWE's room where Joe recommended that his sister let (A) represent her. At that time, EWE signed an employment-retainer/power of attorney contract with (A). The contract was witnessed by Joe. This contract provided for a thirty-three and one-third percent (33 1/3%) fee from any recovery.
Once (A) was employed by EWE, he initiated his investigation into the facts and circumstances surrounding the accident. On April 13, he returned to Newton and began his investigation into the accident. He was assisted in this investigation by Joe. On April 15, (A) wrote a letter to EWE telling her that he was working on her case and outlining the procedures involved in processing the lawsuit. Also on April 15, (A) wrote a letter to the agent for the railroad advising him of his representation.
Meanwhile, the firm of (B) and (C) from Jackson, Mississippi entered the picture. (B) and (C) were notified by EWE's cousin, "Cockroach", of the accident and EWE's possible need for a lawyer. (B) and (C) travelled to Newton, Mississippi, on April 15, where they, "Cockroach", and Joe, went to the hospital to see EWE. During their visit EWE indicated that she had been in contact with another lawyer. Messrs. (B) and (C) testified that they immediately left the hospital, saying they could not talk to *131 EWE while she was represented by another attorney. On April 17, 1985, two days later, however, (B) again went to Meridian to see EWE. While there he was given a letter prepared by Joe, addressed to (A), signed by EWE, dismissing (A) from EWE's case. (B) and EWE then executed an employment contract. (B) was asked to take the letter with him and mail it. Prior to mailing he read the letter and took it with him to Jackson, where he mailed it. No copy was made. The new contract provided for a contingency fee of thirty-three and one-third percent (33 1/3%) if the claims were settled prior to suit being filed and forty percent (40%) if suit was filed. (A) was never directly contacted by (B) or (C) throughout these events.
EWE wrote another letter to (A) on May 9, 1985, notifying him that his services were no longer needed. This letter was composed, typed and mailed by the firm of (B) and (C). Before he received this letter (A) had negotiated a settlement for the policy limits with Ruby's insurer. After he received this notification (A) continued to work on the settlement agreement. From the settlement, (A) retained his one-third contingency fee. He says that the settlement was approved by EWE. The proof on this point is far from clear. The tribunal found that (A)'s conduct did not prejudice EWE's case or cause her any damage.

I.
We are writing here not so much to address the allegations which were brought against Attorney (A), but one allegation which was not brought against him.
Rule 7.3 states:
A lawyer may not solicit professional employment from a prospective client with whom the lawyer has no family, close personal or prior professional relationship, by mail, in person or otherwise, when a significant motive for the lawyer's doing so is the lawyer's pecuniary gain. The term "solicit" includes contact in person, by telephone or telegraph, by letter, or other writing, or by other communication directed to a specific recipient, but does not include letters addressed or advertising circulars distributed generally to persons not known to need legal services of the kind provided by the lawyer in a particular manner, but who is so situated that they might in general find such services useful.
This rule is comparable to DR 2-104(A), in effect at the time of these events, which provides that "a lawyer who has given in person unsolicited advice to a lay person that he should obtain counsel or legal action shall not accept employment resulting from that advice." From the facts in this case, it is distressingly clear that these lawyers, (A) and the firm of (B) and (C), personally solicited employment from EWE. They sought her out in her hospital room (the Respondent, at least, while she was under sedation) brought with them and had her sign employment contracts. She did not seek out or send for either of the attorneys. She apparently fired the Respondent at the instance of (B) and (C). She said she did it "for no particular reason."
The misadventures of these attorneys and the disservice to the client, EWE, are illustrative of the rationale which undergirds Rule 7.3 prohibiting direct solicitation of clients. Here we find an injured and sedated victim of an auto-train collision being manipulated and used by those whom she trusts to protect her. It is evident that her interests were not the paramount objective.
There is a probability, almost amounting to a certainty, that Rhonda and Cockroach are "runners" for (A) and (B) and (C), respectively, motivated by the prospect of referral fees for recommending these lawyers to EWE and assisting in obtaining contracts with her.
We can only speculate as to Joe's reasons for changing his recommendation of lawyers. But our experience with human nature leads us to suspect that he was also influenced by the prospect of personal pecuniary gain, perhaps by a raise in the ante. Equally obvious is the fact that (A) and (B) and (C) were less interested in EWE, than in the prospect of a fee. Lawyers are entitled to be paid for their services, *132 but when they seek out the injured client, previously unknown to them, and solicit the contract of employment, it is clear that they are pursuing their own, not the client's interests. We find the behavior of all parties to be contrary to professionally responsible representation of the client.
The United States Supreme Court succinctly stated the danger inherent in in-person solicitors in Ohralik v. Ohio State Bar Assn., 436 U.S. 447, 461, 98 S.Ct. 1912, 1921, 56 L.Ed.2d 444, where it is stated in ft. n. 19:
A lawyer who engages in personal solicitation of clients may be inclined to subordinate the best interests of the client to his own pecuniary interests. Even if unintentionally, the lawyer's ability to evaluate the legal merit of his client's claims may falter when the conclusion will affect the lawyer's income. A valid claim might be settled too quickly, or a claim with little merit pursued beyond the point of reason. These lapses of judgment can occur in any legal representation, but we cannot say that the pecuniary motivation of the lawyer who solicits a particular representation does not create special problems of conflict of interest.
See also J.L. Simmons, Jr., Lawyer Professionalism (1988).
The behavior of all the parties in this case indicates the wisdom of the Supreme Court in pointing out the dangers inherent in the practice of personal solicitation. This whole affair is a sordid mess which reflects discredit upon the legal profession and especially upon the lawyers involved. We suspect that the tribunal's evaluation of the evidence, which we do not criticize, was influenced to a considerable degree by its instinctive disapproval of the behavior of the complaining lawyers throughout the affair. We share that disapproval. The Respondent should not have solicited the employment, either, and he certainly should have taken more careful steps to assure that he was authorized to conclude the settlement with the insurance carrier. The only thing we can say by way of extenuating circumstances is that (A) may have thought that his action was necessary for the client's protection in preventing a delay in her receipt of the funds.
These lawyers are officers of this Court, and this Court cannot permit the behavior disclosed in this record to go unchallenged nor allow the participants to so conduct themselves in the practice of law with impunity. The tribunal below has conducted a long and distasteful inquiry into the matter. Because of the manner in which the controversy arose, the way the issues were framed, the tribunal felt that it could not say that the charges were supported by clear and convincing evidence. This Court, however, is satisfied from the record that it cannot allow the matter to pass without the strongest possible statement of its disapproval, so that the lawyers involved, and the Bar, may be advised with no uncertainty, that such behavior as described above does not meet acceptable standards, violates established rules, and reflects discredit upon all involved. The clerk is directed to mail a copy of this opinion to all attorneys who were contracting parties with the client.
Subject to the foregoing, the order of the tribunal is affirmed.
AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, ROBERTSON, SULLIVAN, ANDERSON and PITTMAN, JJ., concur.